656 A.2d 348

Earl S. MAKELL

v.

STATE of Maryland.

No. 1048, Sept. Term, 1994.

Court of Special Appeals of Maryland.

April 4, 1995.

336

Gary S. Sedlik, Student Atty. (Ira Mickenberg, Assigned Public Defender on the brief) Washington, DC, for appellant.

Kimberly Smith Ward, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty., for Baltimore City on the brief) Baltimore, MD, for appellee.

Argued before MOYLAN, WENNER and SALMON, JJ.

MOYLAN, Judge.

The resolution of this appeal requires us to go through the recent Court of Appeals opinion in *Nance v. State,* 331 Md. 549, 629 A.2d 633 (1993), with a fine-tooth comb and to separate the wheat of its actual holding from the chaff of its merely descriptive detail.

The appellant, Earl S. Makell, was convicted by a Baltimore City jury, presided over by Judge Elsbeth Levy Bothe, of manslaughter and the use of a firearm in the commission of a crime of violence. On this appeal, he raises the single contention that Judge Bothe erroneously relied on *Nance v. State* as a basis for admitting the hearsay declarations of Willy Ferguson.

At approximately 11:45 P.M. on July 27, 1993, Michael Thomas was shot and killed in an alley near the intersection of Liberty Heights Avenue and Woodbine Street in Baltimore City. Three bullet shell casings were found by the police at the crime scene.

During the investigative stage, Willy Ferguson gave promise of being the State's indispensable witness. During the pretrial phase of this prosecution, Ferguson did three things

that later took on pivotal significance. He participated in an identification procedure in which he was shown a photographic array. He selected a photograph of the appellant as the man he had seen engaged in an altercation with Michael Thomas just before Thomas was killed.

Willy Ferguson then gave Detective Chauriont a statement that was reduced to writing and signed by Ferguson. In the course of that statement, Ferguson recounted that Michael Thomas was a close friend of his. He also stated that he knew the appellant. The crux of his statement was that on the evening of July 27, 1993, he was at the intersection of Liberty Heights and Woodbine and saw Michael Thomas and the appellant fighting. He saw the appellant chase Thomas into the alley and then he heard three shots. Approximately one minute later, Willy Ferguson entered the alley and saw Thomas lying on the ground. Having read his statement, Ferguson told the police that it was accurate. He then signed and dated the statement.

Willy Ferguson's third significant pretrial act was his testimony before the Baltimore City Grand Jury. Ferguson was reminded of the penalty for perjury and then testified under oath. That testimony was duly recorded *verbatim*. In its detail, it was even more damning, from the appellant's point of view, than had been Ferguson's signed statement to the police. Ferguson again testified that he had seen Michael Thomas and the appellant fighting. He added that he saw someone hand a gun to the appellant. He described how the appellant chased Thomas into the alley, shot him in the back, and then shot him two more times. He testified that the appellant initially walked away from the prostrate Thomas, then returned and shot Thomas two more times, and finally ran from the scene.

The Willy Ferguson who showed up at the trial, however, was far different from the Willy Ferguson who had assisted first the police and then the grand jury in the course of their investigations. We may never know why. Under oath at trial, Ferguson testified 1) that he did not know Michael

Thomas, 2) that he did not know the appellant, and 3) that he had not been present at the scene of the shooting. It goes without saying that Ferguson's trial testimony was significantly inconsistent with his pretrial declarations.

Ferguson could not (or would not) identify the appellant at trial. He testified, moreover, that he could not recall ever having selected a photograph of the appellant from a photographic array. He testified further that he was unable to remember whether he had ever provided the police with a written statement on the morning after the shooting. He acknowledged that the signature on the statement might be his but he could not recall ever having signed the statement. Ferguson could not recall, moreover, any details of his grand jury testimony. More sweepingly, he claimed that, because of his continuous multi-year drug stupor, he could not accurately perceive, understand, or remember anything that happened from 1988 through 1994.

Finding little sustenance in Willy Ferguson's trial testimony, the State turned, of necessity, to his pretrial declarations. Under the authority of *Nance v. State,* Judge Bothe admitted 1) the pretrial identification, 2) the written and signed statement given to the police, and 3) the grand jury testimony. The appellant raises no challenge to the pretrial identification but argues strenuously that both the statement to the police and the grand jury testimony were inadmissible hearsay unredeemed by *Nance.*

With respect to Willy Ferguson's written and signed statement to the police, the straight holding of *Nance,* 331 Md. at 569, 629 A.2d 633, seems clear enough:

> We hold that the factual portion of an inconsistent out-of-court statement is sufficiently trustworthy to be offered as substantive evidence of guilt when the statement is based on the declarant's own knowledge of the facts, is reduced to writing and signed or otherwise adopted by him, and he is subject to cross-examination at the trial where the prior statement is introduced. (Footnote omitted.)

■ Willy Ferguson's out-of-court statement to the police was, as we have noted, inconsistent with his trial testimony. That statement was based on Ferguson's own knowledge (his direct observation) of the facts. The statement was reduced to writing and signed by him. Ferguson, moreover, was present at the trial on the witness stand and was available to the appellant for cross-examination.

■ Similarly with respect to Willy Ferguson's grand jury testimony, the straight holding of *Nance* in that regard, 331 Md. at 571, 629 A.2d 633, seems clear enough:

[A] statement given before a grand jury is made in an atmosphere of formality impressing upon the declarant the need for accuracy; and it will be memorialized in a manner that eliminates concerns about whether the statement was actually made. The declarant must also, of course, be present as a witness at trial to be tested by cross-examination in regard to the former grand jury appearance and its contents. When all of these conditions have been met, due process of law is satisfied. The grand jury testimony . . . in the instant case properly could have been considered by the jury as substantive evidence. (Citation omitted.)

Willy Ferguson's grand jury testimony was inconsistent with his trial testimony. The grand jury testimony was given in an atmosphere of formality calculated to impress on Ferguson the need for accuracy. It was, furthermore, memorialized in a manner that eliminated all concern about whether it was actually made. Once again, Ferguson was present at the trial on the witness stand and was available to the appellant for cross-examination.

Even staring down the gun barrel, however, the appellant still wriggles heroically to distinguish his situation from that before the Court of Appeals in *Nance*. There are, of course, multitudinous factual distinctions between this case and *Nance*. The question is whether any one of them makes any real difference. For our part, all of them that do not find their way into the formal holding are distinctions without a difference. For the appellant's part, every factual circum-

stance that the *Nance* opinion took the trouble to describe must perforce be treated as a *sine qua non* for the *Nance* decision.

We will indulge the appellant in the consideration of his various subcontentions, hoping it may, once and for all, lay them to rest, lest other litigants be able to exploit them.

The appellant's brief states his central thesis:

> The hearsay evidence presented in this case has none of the critical indicia of reliability that the court in *Nance v. State* relied upon for its holding. The rationale of *Nance*, therefore, is inapplicable . . .

Again, the appellant attempted to tie the *Nance* holding to its "particular facts":

> Based on the particular facts of *Nance*, the court held that the extrajudicial statements could be admissible if certain requisite factors indicating reliability were satisfied.

He then posits, instance by instance, his versions of what he believes those "critical indicia of reliability" or those "particular facts" were that *Nance* necessarily "relied upon."

### Three "Turncoat Witnesses" vs. One

█ Articulating it most clearly in his reply brief, the appellant asserts that there is a pivotal difference between a case, such as *Nance*, involving three "turncoat witnesses" and a case involving but one:

> The State ignores the significant factual differences between *Nance* and *Makell*, all of which were essential to the narrow holding cited above. These differences include: (1) the three separate eyewitnesses testifying in *Nance*, versus only one witness in *Makell* . . .

In the present case, Willy Ferguson was all by himself as a "turncoat witness." In the *Nance* case, by contrast, there were three such witnesses: Rodney McCormick, Antonio Harris, and Thomas Brown. The appellant places great significance on the fact that in *Nance* "all three witnesses readily testified as to some of the events, but claimed a selective loss

of memory about important facts incriminating the defendants." He notes that the *Nance* opinion commented on the fact that all three key witnesses had similar memory lapses and that all three of the witnesses recanted their testimony in a similar manner, calling it "a most unlikely coincidence that was meaningful in itself." 331 Md. at 564, 629 A.2d 633. The distinction that the appellant deems to be critical is:

As Ferguson was the sole witness purporting to provide direct evidence of guilt, the jurors in [this case] did not have the "unlikely coincidence" of seeing all key witnesses recant identically at trial, with the resulting implications for credibility imputed by the court in *Nance*.

*Nance*'s reference to the "most unlikely coincidence" and the entire discussion of all key witnesses having similar selective losses of memory occurred at the end of a self-contained analysis of the admissibility of prior extrajudicial identifications, provided that "the out-of-court declarant is present at trial and subject to cross-examination." 331 Md. at 560–64, 629 A.2d 633. The *Nance* opinion pointed out that, on this evidentiary issue, it was simply reaffirming well-settled, pre-existing Maryland law. *See, e.g., Bedford v. State,* 293 Md. 172, 443 A.2d 78 (1982). The lead-in to the discussion from which the appellant seeks to derive special comfort was *Nance*'s analysis of the traditional rationale for the well-settled law:

The rationales for this exception to the rule against hearsay have been fully articulated. The extrajudicial identification is admitted for its greater probative value because it occurred closer to the time of the offense, and is therefore more likely to be accurate. It is admitted because the original identification was made under less suggestive circumstances than those existing at trial, and is accordingly more reliable. (Citations omitted.)

331 Md. at 561, 629 A.2d 633.

The two appellants in the *Nance* case then sought to distinguish the extrajudicial identifications offered against them from those that had received the blessings of the courts

in earlier cases. The *Nance* appellants pointed out that most instances of admissibility are where witnesses have made prior extrajudicial identifications but are simply unable to make identifications in the courtroom. They pointed out that, by contrast, the identifying witnesses in their case had recanted the earlier identifications. For several pages, the *Nance* opinion surveyed the case law around the country and concluded that a recantation by an identifying witness is not fatal to the admissibility of an extrajudicial identification. 331 Md. at 561–64, 629 A.2d 633.

It was in this regard that the Court of Appeals reverted to its themes 1) that an extrajudicial identification is "more likely to be accurate" than an in-court identification because it is made "closer to the time of the offense" and 2) that an extrajudicial identification is "more reliable" because it is made "under less suggestive circumstances than those existing at trial." 331 Md. at 561, 629 A.2d 633. By way of then applying that general wisdom to the facts of the *Nance* case, the Court of Appeals referred to the miscellany of indications that scullduggery may well have accounted for the recantations at trial and the relative unreliability of that trial testimony:

> [T]here was evidence from which the jury could infer that the witnesses had made truthful identifications out of court, only to become disingenuous at trial. There was evidence that an atmosphere of fear and threats of reprisals existed in the interim between the crime and the trial. Witness Antonio Harris was bound by fraternal ties to his half-brother, Nance. The witnesses at trial experienced only a selective failure of memory; they remembered the innocuous features of their prior statements, but forgot the incriminating assertions bearing on identification. Finally, the jurors no doubt perceived that *all* of the key witnesses similarly recanted, a most unlikely coincidence that was meaningful in itself. (Emphasis in original.)

331 Md. at 563–64, 629 A.2d 633.

All of this, including the passing reference to the plurality of "all of the key witnesses similarly recant[ing]," was simply

part of the Court's argument as to why evidence of an extrajudicial identification will, as a general principle, survive a courtroom recantation. The facts of the *Nance* case were simply offered as proof of the traditional wisdom that extrajudicial identifications are frequently "more reliable" than in-court testimony because they are less vulnerable to intervening venality. The appellant may not, by plucking a toothsome morsel completely out of context, impose a limiting condition that the *Nance* holdings do not even arguably suggest.

The *Nance* case, coincidentally, involved three "turncoat witnesses." That coincidental fact was of no significance whatsoever to the *Nance* decision. The *Nance* holdings would have been precisely what they were if only one "turncoat witness"—any one of the three—had been involved.

### Threats, Intimidation and Family Ties

Again expressing it most succinctly in his reply brief, the appellant cites as one of the distinctions which he posits as "essential to the narrow holding" of *Nance:*

the evidence of threats against the witnesses and familial ties in *Nance,* versus the total absence of any motive to fabricate trial testimony in *Makell* ...

There was, indeed, evidence in the *Nance* case that two of the turncoat witnesses, Antonio Harris and Thomas Brown, had received at least implied threats that ill fortune might befall them if they testified against the defendants. There was also evidence that Antonio Harris was the half-brother of the defendant Nance. The allusions to this evidence in the *Nance* opinion, however, came only in the course of the opinion's statement of facts, recounting in full detail everything that the witnesses had said or done pretrial as well as everything they did on the witness stand. These particular facts did not figure in any meaningful way in the subsequent legal analysis or as elements in *Nance*'s holdings.

They deal, moreover, neither with the prerequisite of being available for cross-examination nor with the special indicia of trustworthiness that makes certain prior inconsistent state-

ments admissible as substantive evidence. The coincidental facts stressed by the appellant in this subcontention go only to the possible reason *why* a "turncoat witness" turned his coat. Neither the *Nance* opinion specifically nor the mainstream of American law that *Nance* deliberately joined care one whit why the testimonial inconstancy comes about. It may be through fear or intimidation. It may be for love or affection. It may be for cold hard cash. It may be because of loss of memory, partial or total, genuine or perjurious, as a result of drugs, alcohol, amnesia, senility, mental retardation, the mere passage of time, or for any other reason. It may be out of sheer perversity. It may be for no reason at all. It may be for reasons unknown. The law's only concern is with *what* happens in this regard, not with *why* it happens. The appellant seeks to rely on a factor that is immaterial to the admissibility equation.

### *The Hobgoblin of Consistency*

The appellant seeks to establish as an "essential" predicate for *Nance* the fact that the three turncoat witnesses there, in their respective pretrial performances, were consistent with each other. We have already disposed of that factor in pointing out that a unitarian interpretation of *Nance* would be just as valid as would a trinitarian interpretation.

The appellant goes further, however, and points out that in *Nance* each of the pretrial statements to the police was internally consistent with the grand jury testimony of that particular witness. The wedge of distinction the appellant then attempts to drive is that in this case Willy Ferguson's grand jury testimony differed in some significant details from his written and signed statement to the police. Again, however, it is a distinction without a difference.

What is initially required by *Nance* is that the out-of-court declarations of a witness be *inconsistent* with the witness's trial testimony. If there are more than one out-of-court declarations, consistency or inconsistency between or among them is inconsequential. For purposes of admissibility, they

are to be measured against the trial testimony, not against each other.

In *Sheppard v. State,* 102 Md.App. 571, 650 A.2d 1362 (1994), we were dealing with two witnesses, both of whose trial testimony was inconsistent with pretrial statements each had given to a defense investigator. Before talking to the defense investigator, however, each of the witnesses had earlier given the police statements that were inconsistent with the subsequent statements given to the defense investigator. Although the circumstances at bar do not precisely replicate the circumstances in *Sheppard,* the seal of approval we placed on otherwise qualifying evidence under *Nance,* notwithstanding internal inconsistency, was a very broad one:

> Theoretically, there is no reason why a jury could not look upon a witness and consider his sworn testimony and then be presented with a smorgasbord of earlier versions of events given by that witness—some resolutely consistent with the trial testimony, some wildly inconsistent, and others at various points between. Opposing counsel could then have a field day testing, probing, impeaching, and rehabilitating. It would fall the ultimate lot of the jurors to choose on which, if any, version—or amalgam of versions—to bestow decisive weight and credibility.

102 Md.App. at 577, 650 A.2d 1362.

◼ Should the internal inconsistency argument fail him, the appellant falls back on the broader indictment that Willy Ferguson's very status in life makes anything ever said by him inherently untrustworthy:

> The fact that Ferguson was a known drug offender makes his testimony inherently untrustworthy and unreliable because he had a strong incentive to satisfy his police contacts and keep himself out of trouble.

*Nance,* however, is not so rigid in its rejection. With respect to Ferguson's out-of-court statement given to the police, *Nance* holds unequivocally that it

> *is sufficiently trustworthy* to be offered as substantive evidence of guilt *when* the statement is based on the declar-

ant's own knowledge of the facts, is reduced to writing and signed or otherwise adopted by him, and he is subject to cross-examination at the trial where the prior statement is introduced. (Emphasis supplied.)

331 Md. at 569, 629 A.2d 633. *Nance* added no proviso that redeeming trustworthiness shall not be available to out-of-court declarations made by drug offenders. Willy Ferguson's statement satisfied all of the qualifying criteria.

With respect to his grand jury testimony, moreover, *Nance* held clearly that, because of his station in life, Willy Ferguson is not forever cast out as someone beyond the testimonial pale:

The requirements of an oath and testimony given under penalty of perjury discourage lying, reminding the declarant of punishment by both supernatural and temporal powers. The formal setting, oath, and the reminder of perjury all convey to the declarant the dignity and seriousness of the proceeding, and the need to tell the truth. (Citation omitted).

331 Md. at 571, 629 A.2d 633. *Nance* did not deny the saving grace of the trustworthiness conditioning devices to ostensible drug offenders.[1]

### *Cross–Examining a Forgetful Witness*

At the threshold of looking for the required inconsistency between a witness's disappointing trial performance and his more promising pretrial performance, *Nance,* 331 Md. at 556, 629 A.2d 633, treated a claimed loss of memory as simply one form of recantation:

---

**1.** The appellant, otherwise so meticulous in looking for distinctions between this case and *Nance,* has ironically relied on, for this fall-back argument, a circumstance which this case had in common with *Nance,* though he conveniently fails to mention the similarity. All of the players in *Nance,* defendants and turncoat witnesses alike, were closely associated with the drug-dealing sub-culture. The killing in that case was in the course of a turf war. That fact about the witnesses gave the *Nance* Court no pause at all.

At trial, *the witnesses recanted,* either by disavowing their prior identifications and statements or *by claiming no memory* of them. (Emphasis supplied.)

The appellant argues, however, that when the witness's memory loss is total rather than partial, the person on the stand is no longer a mere recanting witness but has become the equivalent of a non-witness, a warm body with no testimonial function. He claims that total memory loss renders a person, even though otherwise present and willing to testify, realistically unavailable for cross-examination.

*Nance,* of course, did not treat the forgetful witnesses in that case as unavailable for cross-examination. In groping for a distinction between this case and *Nance,* however, the appellant seizes on the fact that the two witnesses in *Nance* who claimed memory losses, Harris and McCormick, suffered only *selective* losses of memory rather than total losses. Because the memory lapses in *Nance* were only selective, the appellant argues, the defendants there had at least some residual opportunity to cross-examine those witnesses. In the present case, by contrast, Willy Ferguson could not answer any questions concerning the occurrence of the crime. From this, the appellant concludes:

> Although Ferguson took the stand, he was effectively unavailable for cross-examination.... The mere fact that Ferguson took the witness stand and recited a series of "I don't recalls" to defense questions does not amount to an effective opportunity to cross-examine by the defense....
>
> Despite the fact that Ferguson was present in the courtroom and testified under oath, his mere presence on the witness stand coupled with his inability to recall any of the facts of the event made cross-examination regarding the earlier statements impossible.

The argument made by the defendants in *Nance* was precisely that made by the appellant here:

> All of the variations upon the rule permitting probative use of out-of-court identifications and statements require that the declarant be present at trial for cross-examination.

Petitioners argue that the witnesses' claimed loss of memory at trial about past events effectively denied the defense any real chance to cross-examine them about their out-of-court identifications and statements.

331 Md. at 571–72, 629 A.2d 633. In rejecting the claim that a witness's memory loss amounted to unavailability for cross-examination, the *Nance* opinion gave examples of what true "unavailability" might be:

Witnesses who are not actually available for cross-examination despite their presence in court are, for example, those who refuse to testify by asserting the spousal privilege or the privilege against self-incrimination. That was not the case here. (Citation omitted.)

331 Md. at 572, 629 A.2d 633.

*Nance* did, to be sure, comment on the fact that the claimed memory losses in that case were selective—indeed, conveniently and suspiciously selective. 331 Md. at 572, 629 A.2d 633. Such comment, however, was only by way of casting a wry aspersion on the *bona fides* of their claims. "The tendency of . . . untruthful witnesses to seek refuge in forgetfulness is well recognized." *Id.* It by no means established a *sine qua non* that some memory of events must remain if the out-of-court declarant is to be deemed available for cross-examination.

*Nance* was not a single monolithic decision. It was an omnibus opinion dealing with nine distinct instances of pre-trial actions or statements being received for their substantive value—two extrajudicial identifications, two instances of grand jury testimony, and five pre-trial statements to the police. Three of those instances are exact parallels to Willy Ferguson's situation in the present case.

Two of those instances involved the witness Antonio Harris. One out-of-court declaration that was received was his grand jury testimony, as to which he, on the witness stand, drew a total blank. "Harris further testified that he did not remember his grand jury testimony." 331 Md. at 557, 629 A.2d 633. Another was a signed statement he had given to the police on

November 26, 1990. He acknowledged his signature on that statement, but "had no memory of the questions and answers" and had "no current memory" of the events dealt with by those questions and answers. *Id.* He, like Willy Ferguson here, attributed his memory loss to chronic drug abuse.

> Harris could not explain how the police obtained the information contained in his ... November 26 statement[ ] to detectives. He could not explain how the grand jury obtained the information contained in his transcribed testimony. He contended that he was steadily intoxicated by drugs throughout the months in question.

331 Md. at 557, 629 A.2d 633. With respect to those two admissibility issues, Antonio Harris's loss of memory was as total and abject as that of Willy Ferguson in this case.

The third parallel instance involved the grand jury testimony of Rodney McCormick. "McCormick testified that he had no memory of his appearance before the grand jury." *Id.* "Harris and McCormick also suggested that heroin intoxication had eradicated their memories." 331 Md. at 573, 629 A.2d 633. With respect to his grand jury appearance, Willy Ferguson did no worse than that.

In none of those three instances was there any opportunity for the *Nance* defendants to cross-examine the out-of-court declarants about the content of the out-of-court declarations. There was no opportunity to ask for clarification or to resolve ambiguities, to probe the motives behind the declarations, to test the accuracy of the declarations, or to assess the credibility of the declarants. According to the *Nance* criteria, those out-of-court declarations were nonetheless held to be admissible. We see no principled difference between them and the out-of-court declarations of Willy Ferguson now before us.

In rejecting the claim that the loss of memory rendered the declarants unavailable for cross-examination, *Nance,* 331 Md. at 571–74, 629 A.2d 633, made no distinction between partial and total memory loss. *Nance* relied heavily on *United States v. Owens,* 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), which also failed to make any such distinction. *Nance,* 331

Md. at 573, 629 A.2d 633, quoted with approval the *Owens* analysis:

> Ordinarily *a witness is regarded as 'subject to cross-examination' when he is placed on the stand, under oath, and responds willingly to questions.* Just as with the constitutional prohibition, limitations on the scope of examination by the trial court or *assertions of privilege* by the witness *may undermine the process to such a degree that meaningful cross-examination within the intent of the Rule no longer exists. But that effect is not produced by the witness' assertion of memory loss*—which ... is often the very result sought to be produced by cross-examination, and can be effective in destroying the force of the prior statement. (Emphasis supplied.)

484 U.S. at 561–62, 108 S.Ct. at 844.

The examination of Willy Ferguson on the witness stand, notwithstanding his almost complete lack of recall, actually was exceedingly successful from the appellant's vantage point. The State's case against the appellant consisted almost entirely of Ferguson's out-of-court declarations. It came out, through Ferguson's admission on the stand, that he was a chronic drug abuser. The erosion of credibility inevitably produced by such a revelation would undermine the trustworthiness of a "junkie's" out-of-court declarations as surely as it would undermine his trial testimony. Ferguson's claimed collapse of memory, whether seen as a subterfuge or as the result of a brain "fried" by heroin, could only have denigrated the reliability of any pretrial declaration by such person.

Few cross-examinations, no matter how detailed or how probing, could hope to score higher than the appellant did at Willy Ferguson's expense. *Cf. California v. Green,* 399 U.S. 149, 159, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489, 497 (1970) ("The most successful cross-examination ... could hardly hope to accomplish more than has already been accomplished by the fact that the witness is now telling a different, inconsistent story, and—in this case—one that is favorable to the defendant.")

In asserting that his multi-year drug stupor had destroyed his ability to recall anything between 1988 and 1994, Willy Ferguson effectively impeached the accuracy of both his signed statement to the police and his grand jury testimony. Defense counsel also developed from him on the witness stand that Ferguson had not spoken to defense counsel or anyone in counsel's office in reference to the instant case. He asserted that no one had offered him any money to testify. Defense counsel thereby was able to bring out the absence of bias and the absence of any motivation on Ferguson's part to testify favorably for the defense. Pertinent here is the observation of *United States v. Owens,* 484 U.S. 554, 559, 108 S.Ct. 838, 842, 98 L.Ed.2d 951, 958 (1988):

> It is sufficient that the defendant has the opportunity to bring out such matters as *the witness's bias,* his lack of care and attentiveness, his poor eyesight, *and even what is often a prime objective of cross-examination, the very fact that he has a bad memory.* (Citation omitted.) (Emphasis supplied.)

Dispositive of the appellant's claim that there is a pivotal difference between selective memory loss and total memory loss is the Supreme Court decision of *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). We refer not to *Green*'s *leitmotif* but to its minor theme. It is the minor theme that has taken on enhanced significance in the years since *Green* was decided.

The major concern of the opinion was with the Confrontation Clause implications of introducing a forgetful witness's prior recorded testimony from a preliminary hearing. The minor theme concerned the admissibility of a prior out-of-court statement given to the police by the forgetful witness. "There is a narrow question lurking in this case concerning the admissibility of Porter's statements to Officer Wade." 399 U.S. at 168, 90 S.Ct. at 1940. In both its major and minor themes, the Supreme Court's concern, of course, was jurisdictionally limited to the constitutional question of compliance with the Confrontation Clause. The Court pointed out, however, that "hearsay rules and the Confrontation Clause are

generally designed to protect similar values." 399 U.S. at 155, 90 S.Ct. at 1933.

The forgetful witness was Melvin Porter, a 16–year–old minor who had been arrested for selling marijuana to an undercover police officer. While in the custody of juvenile authorities, Porter gave a statement to Officer Wade, naming the defendant Green as his supplier. He gave details as to the method of delivery. A week later, Porter testified to the same effect at Green's preliminary hearing.

At the trial two months later, however, Porter proved to be "markedly evasive and uncooperative on the stand." 399 U.S. at 151–52, 90 S.Ct. at 1931. Attributing it to the deleterious effect on the brain of LSD, Porter claimed a virtually total failure of memory:

> [W]hen pressed as to whether respondent had been his supplier, Porter claimed that he was uncertain how he obtained the marihuana, primarily because he was at the time on "acid" (LSD), which he had taken 20 minutes before respondent phoned. Porter claimed that he was unable to remember the events that followed the phone call, and that the drugs he had taken prevented his distinguishing fact from fantasy.

399 U.S. at 152, 90 S.Ct. at 1932.

Under § 1235 of the California Evidence Code, there was then admitted as substantive evidence both 1) excerpts from Porter's preliminary hearing testimony and 2) Porter's out-of-court statement to Officer Wade. The California Evidence Code provided that: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing." The California Court of Appeals reversed the conviction and the California Supreme Court affirmed that decision.

After overturning the California Supreme Court on the major issue of the admissibility of the recorded testimony from the preliminary hearing, the Supreme Court turned its attention to the "narrow question" of the admissibility of Porter's out-of-court statement to Officer Wade. It pointed

out that ordinarily such prior inconsistent statements are deemed to be admissible as substantive evidence because *the declarant* is on the witness stand and *is subject to cross-examination* with respect to the out-of-court declaration. The unusual wrinkle in the *Green* case was that Porter's memory loss arguably rendered him unavailable for such cross-examination:

Here, however, Porter claimed at trial that he could not remember the events that occurred after respondent telephoned him and hence failed to give any current version of the more important events described in his earlier statement.

399 U.S. at 168, 90 S.Ct. at 1940.

In 1970, that minor theme was decidedly low-keyed, for the Supreme Court found it unnecessary to decide whether the loss of memory fatally eroded the witness's availability for cross-examination:

Whether Porter's apparent lapse of memory so affected Green's right to cross-examine as to make a critical difference in the application of the Confrontation Clause in this case is an issue which is not ripe for decision at this juncture. (Footnote omitted.)

399 U.S. at 168–69, 90 S.Ct. at 1940–41.

The scholarly concurring opinion of Justice Harlan, to be sure, addressed primarily the major theme of the *California v. Green* decision. It then turned, however, to the out-of-court statement given to Officer Wade and concluded that the witness's loss of memory was not fatal to the opportunity for cross-examination: "Here the prosecution has produced its witness, Porter, and made him available for trial confrontation. That, in my judgment, perforce satisfies the Sixth Amendment." 399 U.S. at 188, 90 S.Ct. at 1951. (Concurring opinion by Harlan, J.) Justice Harlan concluded in that regard:

The fact that the witness, though physically available, cannot recall either the underlying events that are the subject of an extra-judicial statement or previous testimony

or recollect the circumstances under which the statement was given, does not have Sixth Amendment consequence. *Id.*

For eighteen years that concurring opinion, whatever its persuasive value, remained merely a concurring opinion. Its status, however, changed dramatically in 1988 with the promulgation of *United States v. Owens,* 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988). Turning to the precise issue of the effect of loss of memory on availability for cross-examination, Justice Scalia observed that the Supreme Court had twice failed to resolve the issue. "This Court has never held that a Confrontation Clause violation can be founded upon a witness's loss of memory, but in two cases has expressly left that possibility open." 484 U.S. at 557, 108 S.Ct. at 841. The Supreme Court pointed out that one of those earlier cases, leaving the possibility open, was *California v. Green.* "We declined, however, to decide the admissibility of the same witness's out-of-court statement to a police officer concerning events that at trial he was unable to recall." *Id.*

Justice Scalia then observed that, however diffident the Supreme Court had been generally to address the issue, Justice Harlan had not shrunk from the question:

Justice Harlan, in a scholarly concurrence, stated that he would have reached the issue of the out-of-court statement and would have held that a witness's inability to "recall either the underlying events that are the subject of an extra-judicial statement or previous testimony or recollect the circumstances under which the statement was given, does not have Sixth Amendment consequence."

484 U.S. at 558, 108 S.Ct. at 842.

With that, the erstwhile concurring opinion acquired majority status:

Here that question is squarely presented, and *we agree with the answer suggested 18 years ago by Justice Harlan.* "[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent,

the defense might wish.'" (Emphasis supplied.) (Emphasis in original.)

484 U.S. at 559, 108 S.Ct. at 842.

 The holding that an out-of-court declarant who is present at trial and on the witness stand shall be deemed to be available for cross-examination, notwithstanding a claimed loss of memory, is dispositive not only of any confrontation problem but of any problem under the Hearsay Rule as well. The pivotal concern for both is that the declarant be available. The *Owens* holding, adopting Justice Harlan's position in *California v. Green,* makes no distinction between a selective failure of memory and a total failure. Indeed, the *California v. Green* context in which Justice Harlan formulated the position adopted by *Owens* was one in which the memory failure was virtually total. The memory failure, to be sure, may make the cross-examination more difficult, but as *United States v. Owens* observed:

> The weapons available to impugn the witness's statement when memory loss is asserted will of course not always achieve success, but successful cross-examination is not the constitutional guarantee.

484 U.S. at 560, 108 S.Ct. at 843.

Any quantitative variance between Willy Ferguson's memory loss, on the one hand, and the memory losses claimed by two of the witnesses in *Nance,* on the other hand, is a distinction without a difference.

### *Conclusion*

In order to elevate each unique factor in the *Nance* case into a *sine qua non* for the *Nance* holding, the appellant insists that *Nance* was a "narrow" decision. He qualifies the holding as something "[b]ased on the particular facts of *Nance.*" He argues that the "*Nance* Court based much of its decision on" the special factual circumstances of that case. He treats the pre-*Nance status quo ante* as continuing to be the rule, with *Nance* as a limited and narrow exception to the rule. Even when turncoat witnesses have given inconsistent written

and signed statements or inconsistent grand jury testimony, the appellant seems to argue for the continuation of "the normal rule barring hearsay's admission as substantive proof of guilt" absent a virtual replication of all of the circumstances that were, coincidentally, present in the *Nance* case.

Such, however, is not the case. *Nance* was a broad decision. The *Nance* Court was consciously aware of its wide-ranging repercussions. *Nance* was a bold and express departure from the *status quo*. Maryland abandoned its position as "one of only a handful of states to adhere to the orthodox rule barring use of prior inconsistent statements as probative evidence." 331 Md. at 565, 629 A.2d 633. After considering the pluses and minuses of the so-called "modern rule" and the modified version of the modern rule adopted by five other states, the Court of Appeals, in a broad and deliberate statement of policy, opted for the modified position. "In that it offers additional protection to the rights of an accused, this intermediate course is a wise one." 331 Md. at 569, 629 A.2d 633. Maryland joined the mainstream of American evidentiary law.

*Nance* then set out, as an express holding, the necessary conditions for offering a prior inconsistent statement as substantive evidence. *Id.* It separately set out the preconditions for the admission of grand jury testimony as substantive evidence. 331 Md. at 571, 629 A.2d 633. In no respect were those holdings qualified or hedged in by weasel words such as "in the particular circumstances of this case" or "under the unique facts of this case." Indeed, in *Sheppard v. State*, 102 Md.App. 571, 572–73, 650 A.2d 1362 (1994), we characterized the broad, bold nature of the *Nance* decision:

> Prior to the *Nance* opinion, *Maryland had been "one of only a handful of states to adhere to the orthodox rule* barring use of prior inconsistent statements as probative evidence." . . .
>
> After a scholarly survey by Judge McAuliffe of the respective merits of the orthodox rule, the so-called "modern rule," and a moderated, intermediate version of the modern

rule, *the Court of Appeals* overruled earlier Maryland case law and *expressly adopted the moderated version of the modern rule.* (Citation omitted.) (Emphasis supplied.)

As of July 1, 1994, Maryland codified the changes wrought by *Nance* in Md.Rule of Evidence 5–802.1(a).

The present case falls within the broad and clearly stated rule of *Nance.* Each distinction between this case and *Nance* that the appellant relies on is a distinction without a difference.

*JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.*