771 A.2d 407

**STATE of Maryland**

v.

**Thomas Wayne JONES.**

**No. 2254, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

April 26, 2001.

180

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Jack Johnson, State's Atty. for Prince George's County of Upper Marlboro, on brief), for appellant.

Fred Warren Bennett (Michael E. Lawlor and Bennett & Nathans, LLP on the brief) Greenbelt, for appellee.

Argued before MOYLAN,* HOLLANDER, and JOHN J. BISHOP (Retired, specially assigned) JJ.

HOLLANDER, Judge.

In this appeal brought by the State, we must decide whether the Circuit Court for Prince George's County erred in granting post-conviction relief to Thomas Wayne Jones, appellee, pursuant to the Maryland Post Conviction Procedure Act

---

* Moylan, J. participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

(the "Act"), Md.Code (1957, 1996 Repl.Vol., 2000 Supp.), Art. 27, §§ 645A–645J.[1] The circuit court's ruling stemmed from Jones's trial in December 1996 for the murders of Jamal Johnson and Gary Gulston in 1993, and numerous related offenses involving Michelle and Jeannette Gulston.[2] A jury in the Circuit Court for Prince George's County convicted Jones of kidnaping and first degree felony murder of Gary Gulston, as well as robbery with a deadly weapon, robbery, and use of a handgun in the commission of a felony. As to Jeannette's residence, Jones was found guilty of housebreaking. With regard to Michelle, he was convicted of robbery and robbery with a deadly weapon. The jury did not reach a verdict against Jones as to Johnson's murder, and those charges were subsequently nol prossed.

On January 31, 1997, the trial court sentenced Jones to life without parole for Gulston's murder, and imposed consecutive sentences of twenty years each for the handgun offense and the armed robbery of Michelle. The other convictions were merged for sentencing purposes. In an unreported opinion

---

1. Our original opinion in this case was reported on December 22, 2000. On January 19, 2001, the State filed a "Motion for Reconsideration, Clarification, and Stay of Mandate," ("Motion for Reconsideration"), to which Jones subsequently responded. In light of the State's motion, we recalled our original opinion. We have now determined to grant the State's motion, in part, and to deny it, in part. Accordingly, this amended and substituted opinion is filed to address in one opinion the various issues raised by the State in its original appeal and in its Motion for Reconsideration.

2. Jones was one of several persons charged with the murders and related crimes. We do not have the entire court record from Jones's criminal trial, however. Nor did we have any information about the criminal proceedings against Don Lowell Gutrick, Derrick Smith, or Jason Pinkney, who were also charged in the underlying matter. In the indictment charging Jones, Gutrick is named as the sole co-defendant. Neither Smith, Gutrick, nor Pinkney was tried with Jones.

We shall refer to Michelle and Jeannette Gulston by their first names, in order to avoid confusion. We note that throughout the record and the briefs, the first name of Jeannette Gulston is spelled alternately as "Jeannette" and "Jeanette." Moreover, at trial, she only provided the spelling of her last name. Therefore, we shall use the same spelling employed by this Court in the opinion issued with regard to Jones's direct appeal.

authored by Judge Harrell, we affirmed Jones's convictions. *See Jones v. State*, 119 Md.App. 817 (1998) (*"Jones I "*). Jones did not seek certiorari.

On November 12, 1998, Jones filed a Petition for Post Conviction Relief (the "Petition") pursuant to the Act, claiming numerous errors that constituted ineffective assistance of trial counsel and appellate counsel, as well as trial court error.[3] A primary issue concerned the admission at trial of an inculpatory written statement that Derrick Smith provided to police, which included an incriminating declaration attributed to Don Lowell Gutrick.

After a hearing held on May 20, 1999, the court granted Jones's Petition on August 19, 1999, based on findings of ineffective assistance of trial and appellate counsel, as well as trial court error. Accordingly, the court granted Jones a new trial and a belated appeal.

Thereafter, the State filed an Application for Leave to Appeal, which was granted by Order dated April 12, 2000. On appeal, the State presents one issue for our consideration:

Did the post conviction court err in granting Jones a new trial and a new appeal?

Appellee subsequently moved to strike a portion of the State's reply brief, claiming that the State belatedly raised an argument to support the admission of Gutrick's statement. We shall address the motion to strike, and the State's response to it, in the course of our discussion.

For the reasons set forth below, we shall neither affirm nor reverse the post-conviction court. Instead, we shall remand to the post-conviction court for further proceedings.

## FACTUAL BACKGROUND

### A. The Trial

On July 16, 1993, sixteen-year-old Jamal Johnson and Gary Gulston, who was twenty-three years of age, were brutally

---

3. We shall discuss only those claims on which the post-conviction court based its findings.

murdered in Prince George's County. Johnson's body was found by Prince George's County Police Officer Etiene Jones, who responded at 1:54 p.m. to Michelle's apartment in District Heights, where she lived with her cousin, Gary Gulston. Johnson's body was on the floor of a bedroom, face down in a pool of blood, with a blanket nearby that contained bullet holes and powder burns. Ballistics analysis revealed that he had been shot in the back with a .25 caliber semiautomatic handgun, and in the head with a .45 caliber semiautomatic handgun.

After speaking with Michelle, the police proceeded to the single family home of Jeannette, the mother of Gary Gulston, who resided in Forestville. Gulston's body was found in the basement. He suffered a fatal gunshot wound to the back of his head. Although the police observed that the front door to the residence was ajar, there was no sign of forced entry. A washtub in the basement was found to contain Gutrick's fingerprint.

We shall continue our factual summary by setting forth the "Facts" as summarized by the Court in *Jones I*. We will then supplement those facts with information pertinent to this appeal. In *Jones I*, the Court said:

### FACTS [4]

Michelle Gulston testified that on 16 July 1993 she was in her apartment at 6804 Alpine Street in District Heights, Maryland, with her son. On that day her cousin, Gary Gulston, who also lived in the apartment, received a page on his beeper. Ms. Gulston heard him respond in his return telephone call that he was on his way. Mr. Gulston then left the apartment.

Ms. Gulston was in her bedroom watching television with her son when she heard Mr. Gulston return eight or ten

---

4. We note that the Court's factual summary in *Jones I* was augmented by the Court in the course of its legal discussion. But, we shall include here only those facts presented in the *Jones I* opinion under the heading of "FACTS."

minutes later. Ms. Gulston overheard several people talking, then two men burst into her room yelling that it was a "stick-up." Ms. Gulston testified that she did not see the men's faces clearly because her face was in a pillow and their faces were covered with hoods. The men tied her hands together with a phone cord, and then asked her for money. The men also asked questions about Mr. Gulston, including where he kept his money. She said that she did not know, and the men ransacked her room, taking keys and jewelry.

Ms. Gulston heard other men in the living room asking Mr. Gulston questions about money and drugs. She heard Mr. Gulston say that there was money at his mother, Jeannette Gulston's, house, and that he knew how to disable the alarm at her house. The men took Mr. Gulston with them and left Ms. Gulston's apartment.

Before they left, the men put Jamal Johnson on the bed next to Ms. Gulston's son. Two men remained in the apartment while the others took Mr. Gulston to his mother's house. Fifteen to twenty minutes later, the men returned without Mr. Gulston. Ms. Gulston, whose hands were still restrained by a phone cord, heard someone come into the bedroom, take Mr. Johnson into the living room, turn up the volume on the television, and fire what sounded like two gunshots. Ms. Gulston could not see who fired the shots or how many people were in the apartment because she was still restrained in the bedroom. After the men left the apartment Ms. Gulston freed herself and called police.

After the incident, Mr. Gulston's car, which had been parked in front of the apartment, was found one block away. Ms. Gulston testified that the men had taken Mr. Gulston's car keys and her house keys when they left to go to Jeannette Gulston's house. In addition, a .25 caliber pistol belonging to Ms. Gulston was stolen.

When officers responded to 6804 Alpine Street, they found Mr. Johnson's body with bullet wounds to his back and to the back of his head. At trial, evidence showed that Mr. Johnson was killed by bullets from a .25 caliber pistol. Officers also recovered .25 caliber bullets and shell casings,

a scale, 179 grams of suspected crack cocaine, a shoe box containing plastic baggies and razor blades, a pager, and $2,500.00 cash from Ms. Gulston's apartment. Officers checked Mr. Gulston's car for fingerprints but did not recover any prints.

Officers who responded to 6508 Cricket place, Jeannette Gulston's house, discovered Mr. Gulston's body in the basement. Mr. Gulston was lying on his stomach with a pillow over his head, concealing a gunshot wound to the head. At trial, the State introduced evidence that the bullet recovered from Mr. Gulston's body was fired from a .9mm pistol.

Jeannette Gulston testified regarding the condition of her house. She was out of town at the time of the shooting and returned to find her house ransacked and her previously locked safe unlocked. The contents of the safe, including certificates of deposit, $10,000.00 in savings bonds, and approximately $4,000.00 in cash, were missing.

On 2 August 1993, at approximately 7:00 p.m., appellant was arrested after officers stopped the car in which he was a passenger. Appellant was acting strangely; one officer testified that appellant seemed "very hyper." Officers took appellant to the police station and placed him in an interview room. Detective Kenneth O'Berry read appellant his rights and had appellant sign a waiver form. Appellant wrote on the form that he had used PCP and weed (marijuana). Shortly thereafter, Detective Brian Hickey called Detective O'Berry, who had been questioning appellant, out of the interview room and told him that his supervisor wanted to stop questioning appellant until he slept off the effects of the PCP. Detective O'Berry testified that appellant became loud and boisterous several times while in the interview room.

Detective Andrew Rostich testified that he was in the interview room next to appellant's the night of 2 August 1993. Detective Rostich heard appellant causing several disturbances. At one point, the detective removed all the chairs in appellant's interview room because appellant had been throwing them around. Later, at approximately 2:15 a.m. on 3 August, Detective Rostich hear [sic] another

disturbance. He discovered appellant trying to climb into the ceiling panels from the table in the interview room. The detective pulled appellant down from the table. As he was falling, appellant hit his head on the table, thereby injuring his left eye.

Detective Hickey testified that at 4:00 a.m. on 3 August 1993, he returned to the interview room with some food for appellant. Appellant stated that he wanted to sleep. Detective Hickey noticed that appellant's left eye was red and swollen. Although appellant refused medical treatment the detective took him to the hospital. When appellant returned to the police station from the hospital at approximately 6:45 a.m., Detective Hickey stated that appellant appeared calm.

Detective Richard Delabrer testified that at 7:30 a.m. he entered the interview room to talk to appellant. Detective Delabrer stated that he knew appellant from past cases and had a good rapport with him. The detective read appellant his rights. Appellant indicated that he understood his rights and was not under the influence of drugs or alcohol. Appellant gave a statement implicating himself in the murders of Gary Gulston and Jamal Johnson and the robberies of Michelle Gulston and Jeannette Gulston. Detective Delabrer testified that appellant wrote a statement, then the detective asked appellant a series of questions, and had appellant write down his answers. Appellant reviewed the statement and signed it. The statement was completed by approximately 2:00 p.m. on 3 August 1993.

Derrick Smith, a convicted co-defendant in the case, testified that he made a statement to police regarding the night of 16 July 1993. Mr. Smith, however, denied participation in the murders and testified that the police coerced him into giving a statement implicating himself and appellant. Nevertheless, Mr. Smith's statement was admitted into evidence.

*Jones I,* slip op. at 2–6 (footnotes omitted).

On the evening of August 2, 1993, Jones was arrested in connection with the murders. At the time of his arrest, Jones

was apparently under the influence of PCP, and was later taken to an area hospital for an eye injury. Several hours after Jones's arrest, when the effects of the PCP had evidently worn off, he gave a written statement to the police. Prior to trial, Jones unsuccessfully moved to suppress that statement. In connection with the suppression motion, Jones was represented by William H. Murphy, Jr. and Joseph Niland, the Public Defender for Prince George's County. At trial, Jones was represented only by Niland.

Detective Richard Delabrer testified at Jones's trial concerning Jones's statement to police, which was introduced in evidence. The statement provided, in part:

A few weeks ago I was over this girl named T's house getting high talking when all of a sudden don [sic] [Gutrick] called me back to the bedroom and asked me was I trying to get some quick money so I said yes then he told me that we were going to rob some dude named Gary [Gulston. S]o me, Don [Gutrick], Jason [Pinkney] and Derrick [Smith] waited until the next morning and went to hill top apartments and parked[.][s]o me and Don went in some woods waiting for [G]ary while Jason and Derrick was in the car, and [G]ary pulled up and went in the house[. S]o me and Don went to get Jason and Derrick but by [the] time we got back to his building he was leaving so we waited in his building until he came back and when he came back we took him into the apartment and laid everyone down and asked wheres [sic] the money and drugs and [G]ary told us it was over his mothers [sic] house but he said he would have to take us there because there was a[sic] alarm on the door [s]o me and Don took him there and found a safe and four thousand[. S]o Don kept on saying this aint [sic] all the money and [G]ary [kept] on saying its [sic] some more but I dont [sic] know where its [sic] at because my brother hid it and Don thought he was lying and went and got a pillow and we is about to kill you and I told Don no let's take him back and call his brother and Don said no give me the gun[.] I'll do it[.] Just put the pillow over his head[. S]o I did it and Don shot him once in the head[. S]o we left and went back

to hilltop and I told Don Ill [sic] get the car ready while he go get them and when he upstairs I heard two shots and they came running out to the car and we went over to Jasons [sic] house in Seat Pleasant and split the money 4 ways and Derrick had a 25 that he got.

Jones also said that Gutrick had a .45 caliber weapon, and Smith found a .25 caliber gun in the apartment. Jones added that he wore a hood over his face while in the apartment. Moreover, he denied that he participated in the shooting of Johnson.

By the time of Jones's trial, Derrick Smith had already been convicted. Accordingly, the State called Smith as a witness at Jones's trial. The following colloquy at the outset of Smith's testimony is pertinent:

[PROSECUTOR]: Mr. Smith, where are you presently residing?

[SMITH]: Prison.

[PROSECUTOR]: I'm sorry.

[SMITH]: Prison.

[PROSECUTOR]: Department of Corrections?

[SMITH]: Yeah.

[PROSECUTOR]: And you have previously been convicted in this case; is that correct, Mr. Smith?

[SMITH]: Yeah.

When the State questioned Smith about the events in issue, he unexpectedly denied knowledge of or participation in the murders, to the surprise of both the prosecutor and Jones's defense counsel. Consequently, the prosecutor referred Smith to the written statement that he provided to Detective Rostich after his arrest, which was eventually admitted in evidence. We shall discuss, *infra*, the circumstances culminating in its admission.

According to Smith's statement, the robbery had been planned the day before it occurred, and the group arrived at Gulston's apartment in appellant's car. Smith recounted that Gutrick and appellant were the ones who first approached

Gulston outside the apartment. Further, Smith admitted in his statement that he shot Johnson, because "he seen everybody [sic] face." Additionally, Smith wrote, in part:

Me and Don [Gutrick], T.J. [i.e., appellant], and Jason meet [sic] over Tee's house and then Don called T.J. in the back room. * * * *[5] So we went to Gary [sic] house and robbed him. We was looking for some drugs and money. But there was no money there so Don and T.J. left the apartment with Gary and they did not come back with him. So me and Jason was waiting for them to come back. So went [sic] they came back Don came up stairs and said are you ready to go and we said yes, but before we left we asked him did they get anything and he said yes so we rolled. And then we went over Jason's house to count the money. We counted about 5000 dollar [sic] and we all got about 1100 dollars a peace [sic].

The following portion of Smith's statement is central to this appeal:

[DETECTIVE ROSITCH]: Did Don [Gutrick] or T.J. [i.e., appellant] say anything when they came back [to Michelle's residence]?

[SMITH]: When Don came back upstairs Jason asked him where the other person was at and *he said we* [i.e. Gutrick and appellant] *killed him* [i.e., Gulston].

(Emphasis added).

After Jones's trial, he filed an appeal to this Court, and was represented by Leonard L. Long, Jr. Long raised three issues: the denial of Jones's motion to suppress, the sufficiency of evidence, and the adequacy of the State's Notice of Intention to Seek Life Without Parole. We affirmed in *Jones I.*

As to the suppression motion, Long raised several grounds to support his claim that the trial court erred in denying the motion. Following a thorough consideration of the contentions, the Court concluded that the "trial court properly

---

5. The sentence is omitted because it was redacted at trial.

denied" the suppression motion. Moreover, in finding the evidence sufficient, we recognized the importance of Smith's statement, stating:

*Although Michelle Gulston was not able to identify the robbers, and no fingerprints were recovered from the crime scenes, appellant's statement and Mr. Smith's statement corroborate Ms. Gulston's testimony* and provide sufficient evidence for a jury to find beyond a reasonable doubt that appellant kidnapped Gary Gulston, robbed Michelle Gulston, and broke into Jeannette Gulston's house.

Furthermore, as to appellant's use of a handgun, in his statement he admits that he had a gun, which he handed to Don so that Don could kill Gary Gulston while appellant held a pillow over his head.

Finally, as to the question of whether Gary Gulston was killed while in the process of committing a felony, we find ample evidence that Gary Gulston was killed during the commission of his kidnapping and robbery with a deadly weapon. Appellant claims that because Don killed Mr. Gulston after the robbery, it was an independent and separate act. Appellant's argument has no merit.

\* \* \*

Finally, we note that although a jury could find beyond a reasonable doubt that appellant was a principal offender in the robberies and murder, appellant's convictions could also stem from his participation as an accomplice.

*Jones I,* slip op. at 24–25 (emphasis added).

### B. Post–Conviction Proceedings

On November 12, 1998, Jones filed the underlying Petition, which he supplemented on May 7, 1999, asserting numerous grounds to support his claims of ineffective assistance of trial counsel, ineffective assistance of appellate counsel, and prejudicial errors by the trial court. On May 20, 1999, the court held an evidentiary hearing, at which Jones was represented by Fred Warren Bennett. Murphy, Niland, and Long, Jones's prior attorneys, all testified.

In questioning Niland, Bennett focused on various portions of Smith's trial testimony. The following colloquy is relevant:

[BENNETT]: Is there any tactic or strategy that you can relate to the Court at this time as to why you would not have objected to a prior conviction of a severed co-defendant for the same crime for which the defendant was on trial?

[NILAND]: Well, I think at the time I thought that this man, Smith, admitting that he was convicted of both of these homicides tended to reenforce my theory that alienated the defendant from these homicides or alienated the defendant from participation in these homicides and so I didn't think it was harmful. I thought it was probably—I think my thinking at the time—well, there were a number of things caught up in all of this. Smith surprised me by not testifying. I had been informed before this trial started that both Smith and Gulston [sic] were going to testify against the defendant.

[BENNETT]: Derrick Smith and Don Gulston? [6]

[NILAND]: Yes.

[BENNETT]: All right.

[NILAND]: And of course I was prepared to—I assume they were going to testify in the most unfavorable possible ways that I could imagine.

[BENNETT]: Now, let me stop you there. Such as implicating the defendant?

[NILAND]: Yeah. I was there and saw the defendant and saw the defendant participate in killing this guy.

\* \* \*

[BENNETT]: Now, you said a minute or so ago one of the reasons you may not have objected is the fact that he admitted, that is, Derrick Smith for being convicted of the same crime that the defendant was on trial might give some distance between the defendant and Derrick Smith, right?

---

**6.** Presumably, Niland and Bennett meant Donald Gutrick, not Gary Gulston, as Gulston was one of the homicide victims.

[NILAND]: Yes, and conclusions you might reach about who really were the killers in this case.

Bennett then inquired about Smith's written statement to police, and Niland's failure to object to the hearsay within hearsay portion of Smith's statement, in which Smith quoted Gutrick as saying "we killed him." The following testimony is relevant:

[BENNETT]: All right. Now, so far we've identified from the transcript that your objection was based on you did not want a written statement to go in front of the jury, correct? That's as far as we got so far?

[NILAND]: I think I objected because I didn't want any of the statement to go in front of the jury. *I don't know that I ever was given an opportunity to go into whether the statement conformed to admissibility based on the rule. I don't even know if he let me get into that.* The judge—I started on this statement. I did say what you said which is if you're going to let any of this in it should be testimonial. It shouldn't be the document itself.

\* \* \*

[NILAND]: You're characterizing it by saying that my objection was limited to me—to the written part not coming in as opposed to me indicating that it's OK to leave, to have the—I think that was a secondary objection I made. *I think I objected to the statement coming in.* And then when I saw the writing on the wall, that is that the statement was coming in, I tried to get my half a yard instead of my whole yard, and I asked for him not to let the written part in. So I don't think, I don't think that's wrong. That's all I did. Now, you're right. *In retrospect you have shown me some things in the statement that I could have specifically objected to—*

[BENNETT]: And that's where I'm going to next.

[NILAND]:—*and I didn't. But I don't think that means I didn't object to this whole statement coming.*

[BENNETT]: I agree that you clearly objected to the statement coming in. You're saying that was a fall back.

Your first objection was the statement shouldn't come in at all, but if it does, it should be in a Q and A form and not in the document itself; is that a fair statement?

[NILAND]: Yes, that's a fair statement, yes.

(Emphasis added).

The following testimony is also pertinent:

[BENNETT]: *Would you not agree that that statement was a direct out-of-court statement implicating the defendant in the crime for which he was ultimately convicted?*

[NILAND]: *Yes, it was.*

[BENNETT]: Now, you were aware, were you not, of the *Nance* case at the time of this trial, right?

[NILAND]: Yes.

[BENNETT]: And were you aware in footnote nine in the *Nance* decision where it says "assuming that a prior inconsistent statement can come in, you have a separate objection to a line-by-line statement to portions of the prior inconsistent statements that are hearsay."

[NILAND]: To tell you—I can only say that I had probably by that time read *Nance* a dozen times, reviewed it, given seminars on it, discussed it, considered various ramifications of *Nance* because it was a problem in the defense case at the time. Now, it's maybe a problem in the State's case. But the—I guess the bottom line answer is yes.

I think that the case indicates that if there is extraneous hearsay that the whole thing is based upon hearsay, the whole statement is hearsay. But if there is extraneous or as you say second-hand hearsay or double hearsay or triple hearsay, then that's objectionable because it loses the reliability of being subject to cross[-]examination of the person who it's being attributed to on the part of the defendant. So yes—and that would fall—this would fall clearly into that category. No question about it.

[BENNETT]: Now, you've testified a few minutes earlier that your goal is to keep this out generally. You objected. First, don't let it in under *Nance* and don't let in the written

statement. So your goal at trial was to keep the statement out?

[NILAND]: My goal—when it came up at trial, *this wasn't part of my pretrial preparation because I didn't think it would happen. But once it happened my goal was to keep it out if I could.*

[BENNETT]: *That would include a goal of keeping out a portion of the statement that would be multiple hearsay had you recognized it, correct?*

[NILAND]: *I would think so, especially this piece of hearsay.*

[BENNETT]: So is it fair to say that it was an oversight on your part?

* * *

[BENNETT]: It was an oversight on your part in not recognizing the last question on page six to be multiple hearsay, i.e., [i]t's multiple hearsay, Your Honor. It doesn't qualify even under—

[NILAND]: *I can't attribute it to anything other than an oversight on my part* that I wouldn't have objected to that on that basis.

[BENNETT]: Is it also accurate to say evidence against the defendant at trial consisted generally—that is, the harmful evidence at trial of his statement and the statement of Derrick Smith. They had no fingerprints, did they?

[NILAND]: No, I don't think so. *I don't think there was any kind of physical evidence that tied the defendant to either one of the homicides* that I can recall, not that I can recall. So yeah, his statement.

[BENNETT]: And the [Smith] statement?

[NILAND]: And this statement—*frankly, overall I didn't consider this statement as particularly harmful.* I mean, I guess I was looking at it in its totality at the time.

(Emphasis added).

Appellee's attorney also inquired as to why Niland did not refer the trial court to the Court of Appeals's decision in *State*

*v. Matusky,* 343 Md. 467, 682 A.2d 694 (1996). The following testimony is relevant:

[BENNETT]: ... From what we've gone over so far, you did not object to the document, that is, the physical document or a Q and A on the basis that it was hearsay since it included portions that were not contrary to the penal interests of Derrick Smith, didn't you? That was based on the *Matusky* case?

[NILAND]: Right. I didn't raise that, no.

\* \* \*

[NILAND]: I'm certain I was aware of the *Matusky* case by the time this case came to trial. Now, did I consciously analyze this statement in light of the *Matusky* opinion? I can't say I did, but I might have considered it. But I don't have any recollection.

\* \* \*

[BENNETT]: Now, would there be any trial tactic or strategy involved not to object based on a recent Court of Appeals case [*Matusky*] that would be favorable to your client that you're aware of since you were trying to keep it out?

[NILAND]: Well, I think you would have to ask me about any particular thing that's in here before I can answer that.

With respect to the ineffectiveness of appellate counsel, the question of hearsay within hearsay was also examined. In response to the State's inquiry to Long about his preparation for the appeal, Long said: "I read the transcript, the suppression hearing transcripts as well as the trial transcripts, researched and reviewed relevant case law, visited Mr. Jones, had a conversation with Mr. Jones and prepared the appeal." Long also stated that, with regard to Smith's statement, he "had no basis to raise [the issue of Gutrick's assertion] as an issue on appeal." On cross-examination, however, Long indicated that he did not recall whether he ever reviewed Smith's statement, and he conceded that he did not speak with Niland before preparing the appeal. The following testimony is noteworthy with regard to Bennett's inquiry as to why Long

failed to raise on appeal the issue of Gutrick's assertion, which was contained within Smith's statement.

[BENNETT]: And ... I take it from your not mentioning it, you did not review the State exhibits that were introduced into evidence at trial, did you?

[LONG]: I don't recall whether I did or I didn't....

\* \* \*

[BENNETT]: To the extent that evidence was introduced that wasn't read into the record verbatim in a question and answer form in the statement, you would have to see—in order to see the contents of that exhibit, you would have to review the exhibit; is that right, Mr. Long?

[LONG]: Yes.

[BENNETT]: Now, I'm showing you Defendant's Exhibit No. 6 for purposes of this hearing. This is a statement of Derrick Smith. This was introduced into evidence as State's Exhibit 50 at trial. *You indicated on direct that you did not raise as an issue on appeal anything in regard to the statement of Derrick Smith; is that correct?*

[LONG]: *That's correct.*

[BENNETT]: You said you didn't do so because after review of the motions hearing and the trial transcript *you found that there was no merit to that issue, correct?*

[LONG]: *Yes, in my understanding of the law.*

[BENNETT]: Your understanding of the law. How could you make a determination that there was no merit to the question of the admissibility into evidence as a physical exhibit, the statement in toto without having reviewed the substance of the statement?

[LONG]: I didn't say I didn't review it. I said I don't recall reviewing it.

[BENNETT]: But on direct you were asked what you did and it did not include reviewing the exhibits and talking to the trial attorney?

[LONG]: Correct.

[BENNETT]: And the best you said is you don't recall; is that correct?

[LONG]: Correct.

[BENNETT]: Sir, in reaching that determination that the issue had no merit, that is, the question of the admissibility of the Derrick Smith statement, are you basing that on a Maryland evidence rule or case law or both?

[LONG]: Maryland evidence rule.

[BENNETT]: Is that the rule dealing with the admissibility of prior inconsistent statements that is codified after the *Nance* case, *Nance* versus State.

[LONG]: Yes.

[BENNETT]: Sir, ... [a]re you aware in *Nance* that even if [a] portion of the statement came in a portion may not?

[LONG]: Yes. And I was satisfied that the portion that came in did not contain any opinions or conclusions of the declarant.

\* \* \*

[BENNETT]: *Sir, the redacted version according to the record which has been introduced never took out that portion [of Smith's statement containing Gutrick's assertion.] That statement with that Q and A that I just read to you came in front of the jury. Are you aware of that?*

[LONG]: *No, I'm not.*

[BENNETT]: Had you been aware of it, that would have been a basis to raise on an appeal, wasn't it? That is, the statement contained inadmissable hearsay and, therefore, the Court's ruling in its entirety was not correct?

[LONG]: I'm not prepared to say that:

\* \* \*

[BENNETT]: Hypothetically, had you been aware of that statement and the fact that it directly referred to him by a person who wasn't on the stand, i.e. Don, and aware of footnote nine in *Nance,* you would have raised that on appeal, wouldn't you?

[LONG]: I can't say that I would and I can't say that I would not.

[BENNETT]: And the reason you can't say that, is it not fair to say, sir, is because you didn't review the statement, you didn't review the exhibit and you didn't talk to Joe Niland?

[LONG]: *Well, I didn't review [Smith's] statement.*

[BENNETT]: Didn't review the statement?

[LONG]: I don't have any recollection of reviewing the statement.

[BENNETT]: Wouldn't you say, sir, that in fairness to Mr. Jones as part of a duty as an appellate attorney, that if a statement comes in that implicates your client, that would be something to see if you can raise that on appeal?

[LONG]: *My own understanding of when it came in is that it did not implicate my client.*

(Emphasis added). Long conceded that his failure to raise the hearsay within hearsay issue amounted to a "possible" oversight.

On August 19, 1999, the post-conviction court issued a written opinion and order, amended on August 25, 1999. Relying on *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the court granted Jones's Petition, based on ineffective assistance of trial and appellate counsel, as well as error by the trial court. With regard to ineffective assistance of counsel, the court found various errors that amounted to deficient performance, and concluded that the errors "did result in prejudice to the defendant." The post-conviction court also found prejudicial error by the trial judge in failing to redact Gutrick's hearsay within hearsay assertion from Smith's statement.

Although Jones asserted numerous errors with respect to the performance of his trial counsel, the court below essentially found Niland ineffective for two reasons. First, the court found that Niland failed to object to the evidence of Smith's conviction arising from the same case. Second, the court found that "defense counsel probably should have objected" to

the admission of Smith's statement to police, in which Smith claimed that Gutrick said, "we killed him." Elsewhere in its opinion, the court said that Niland "did object to [Smith's] entire statement," but "did not specifically object" to Gutrick's comment. The post-conviction court also determined that the "cumulative" effect of trial counsel's errors amounted to ineffective assistance, stating:

> With the benefit of hindsight, the Court agrees with [Jones] that certain mistakes were made ... Counsel's trial performance, although generally excellent, did fall below a standard of reasonableness when he failed to object to the admission of the multiple hearsay statement. This, when combined with the cumulative effects of the other, more minor mistakes did result in prejudice to the defendant.

With respect to ineffective assistance of appellate counsel, the court reasoned:

> Petitioner argues that there are three things that an appellate attorney should do, as a matter of course: 1) review the transcripts, 2) review the trial exhibits, and 3) confer with tr[ia]l counsel.... Appellate counsel ... testified that after reading the transcripts, he did not see a basis for raising the issue of the inadmissibility of the redacted statement of Derrick Smith. Appellate counsel admitted that he did not review the exhibits, and did not speak to trial counsel.... The Court agrees that appellate counsel was deficient, said deficiency excuses Petitioner's failure to raise allegations on direct appeal, and that, at a minimum, Petitioner is entitled to a new appeal.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

The post-conviction court granted relief under the Act based on its finding that Jones received ineffective assistance from his trial and appellate attorneys. The right to effective assistance of counsel in a criminal trial is guaranteed by the

Sixth Amendment to the United States Constitution, made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). *Strickland* is regarded as "[t]he fountainhead" in post-conviction claims of ineffective assistance of counsel. *State v. Gross,* 134 Md.App. 528, 550, 760 A.2d 725 (2000), *cert. granted,* 362 Md. 623, 766 A.2d 147 (2001). The "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052.

In *Strickland,* the Supreme Court established the applicable standard to determine whether the legal representation afforded to a defendant comports with the requirements of the Sixth Amendment. *See Williams v. Taylor,* 529 U.S. 362, 389–394, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). To assess the effectiveness of counsel's representation under the Sixth Amendment, the *Strickland* Court created a two-pronged test, consisting of a "performance component" and a "prejudice component." *Id.* at 687, 104 S.Ct. 2052; *see Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

Maryland has consistently applied the *Strickland* test in deciding whether counsel has rendered constitutionally ineffective assistance. *See, e.g., Redman v. State,* 363 Md. 298, 310, 768 A.2d 656 (2001); *Wiggins v. State,* 352 Md. 580, 602–05, 724 A.2d 1, *cert. denied,* 528 U.S. 832, 120 S.Ct. 90, 145 L.Ed.2d 76 (1999); *Oken v. State,* 343 Md. 256, 283, 681 A.2d 30 (1996), *cert. denied,* 519 U.S. 1079, 117 S.Ct. 742, 136

L.Ed.2d 681 (1997); *Gilliam v. State,* 331 Md. 651, 665–66, 629 A.2d 685 (1993), *cert. denied,* 510 U.S. 1077, 114 S.Ct. 891, 127 L.Ed.2d 84 (1994); *Williams v. State,* 326 Md. 367, 373, 605 A.2d 103 (1992); *State v. Thomas,* 325 Md. 160, 170–73, 599 A.2d 1171 (1992), *cert. denied,* 508 U.S. 917, 113 S.Ct. 2359, 124 L.Ed.2d 266 (1993). Under *Strickland,* we must focus on whether counsel's errors were so "serious as to deprive [Jones] of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *see Williams,* 529 U.S. at 393 n. 17, 120 S.Ct. 1495; *Lockhart,* 506 U.S. at 369, 113 S.Ct. 838; *Oken,* 343 Md. at 284, 681 A.2d 30; *Bowers v. State,* 320 Md. 416, 427 (1990). Thus, the defendant must demonstrate that defense counsel's errors were of such a magnitude that his lawyer was "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

■ To establish that trial counsel's representation "was so deficient as to undermine the adversarial process," *Gross,* 134 Md.App. at 551, 760 A.2d 725, a defendant must show that: (1) under the circumstances, counsel's acts resulted from unreasonable professional judgment, meaning that "counsel's representation fell below an objective standard of reasonableness," *and* (2) that the defendant was prejudiced, because "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see Williams,* 529 U.S. at 391; *Lockhart,* 506 U.S. at 369, 113 S.Ct. 838; *Perry v. State,* 357 Md. 37, 80, 741 A.2d 1162 (1999). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

■ Nevertheless, "[t]he object of an ineffectiveness claim is not to grade counsel's performance." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. To be sure, the Supreme Court has recognized that "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best

criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Thus, the review "must be highly deferential," *id.* at 689, 104 S.Ct. 2052, and "the defendant must show that counsel's representation fell below an objective standard of reasonableness," as measured by "prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. In that calculation, a defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (citation omitted). Moreover, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. 2052; *see Cirincione v. State,* 119 Md.App. 471, 492, 705 A.2d 96, *cert. denied,* 350 Md. 275, 711 A.2d 868 (1998). Accordingly, under *Strickland,* a reviewing court must consider defense counsel's performance "as of the time of counsel's conduct." 466 U.S. at 690, 104 S.Ct. 2052.

As we noted, defense counsel's deficient performance is not enough to entitle a defendant to relief. *Strickland* also requires the defendant to establish actual prejudice caused by the deficient performance. *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052; *Redman,* 363 Md. at 309–10, 768 A.2d 656. In other words, even if counsel made "a professionally unreasonable" error, *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052, this alone does "not warrant setting aside the judgment of a criminal proceeding [unless] the error had [an] effect on the judgment." *Id.* Moreover, prejudice is rarely presumed. Ordinarily, the defendant must prove that actual prejudice resulted from counsel's deficient performance. *Redman,* 363 Md. at 311–12, 768 A.2d 656; *see United States v. Cronic,* 466 U.S. 648, 662, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

To establish the requisite degree of prejudice in Maryland, the defendant must demonstrate "a substantial possibility that, but for counsel's unprofessional errors, the

result of the proceeding would have been different."[7] *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. But, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693, 104 S.Ct. 2052. Nor must "the prejudicial effect" satisfy "a preponderance of the evidence standard." *Williams,* 326 Md. at 375, 605 A.2d 103. As we said in *State v. Purvey,* 129 Md.App. 1, 10, 740 A.2d 54 (1999), the focus is not merely on the effect of error on the "outcome." Rather, a " 'proper analysis of prejudice' " includes consideration of " 'whether the result . . . was fundamentally unfair or unreliable.' " (Citations omitted).

A defendant claiming ineffective assistance of appellate counsel is also bound by the *Strickland* standard. *Smith v. Robbins,* 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000); *Gross,* 134 Md.App. at 556, 760 A.2d 725. Nevertheless, as this Court observed in *Gross,* "[a]lthough the basic principles enunciated by *Strickland* remain the same, whether applied to a trial performance or an appellate performance, the juridical events to which those principles apply obviously differ somewhat depending on the operational level being scrutinized." *Id.* at 556, 760 A.2d 725. For example, in *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), the Supreme Court emphasized "the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review." *Id.* at 752, 103 S.Ct. 3308. Similarly, in *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986), the Supreme Court underscored as "the hallmark of effective appellate advocacy" the role of appellate counsel in " 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail. . . ." *Id.* at 536, 106 S.Ct. 2661 (quoting *Barnes,* 463 U.S. at 751–52, 103 S.Ct. 3308).

---

**7.** Although the post-conviction court found prejudice, we observe that it did not explain why or how appellee was prejudiced by the deficient performance of either his trial or appellate counsel, or by any errors of the trial court. Nevertheless, on appeal, the State has not asserted that the finding of the lower court as to prejudice was improper because it was conclusory.

The standard of review of the lower court's determinations regarding issues of effective assistance of counsel "is a mixed question of law and fact...." *Strickland*, 466 U.S. at 698, 104 S.Ct. 2052; *see Gross*, 134 Md.App. at 559–60, 760 A.2d 725. We "will not disturb the factual findings of the post-conviction court unless they are clearly erroneous." *Wilson v. State*, 363 Md. 333, 348, 768 A.2d 675 (2001). But, a reviewing court must make an independent analysis to determine the "ultimate mixed question of law and fact, namely, was there a violation of a constitutional right as claimed." *Harris v. State*, 303 Md. 685, 699, 496 A.2d 1074 (1985). In other words, the appellate court must exercise its own independent judgment as to the reasonableness of counsel's conduct and the prejudice, if any. *Oken*, 343 Md. at 285, 681 A.2d 30. As we said in *State v. Purvey*, 129 Md.App. 1, 10, 740 A.2d 54 (1999), *cert. denied*, 357 Md. 483, 745 A.2d 437 (2000): "Within the *Strickland* framework, we will evaluate anew the findings of the lower court as to the reasonableness of counsel's conduct and the prejudice suffered.... As a question of whether a constitutional right has been violated, we make our own independent analysis by reviewing the law and applying it to the facts of the case." *See Cirincione*, 119 Md.App. at 485, 705 A.2d 96 (stating that "we will defer to the post-conviction court's findings of historical fact, absent clear error," but "we [will] make our own, independent analysis of the appellant's claim.").

## II.

The post-conviction court found that trial counsel was ineffective because he failed to object to damaging evidence of Smith's conviction in the same underlying case. The following colloquy is relevant:

[PROSECUTOR]: Mr. Smith, where are you presently residing?

[SMITH]: Prison.

\* \* \*

[PROSECUTOR]: And you have previously been convicted in this case; is that correct, Mr. Smith?

[SMITH]: Yeah.

In *Clemmons v. State*, 352 Md. 49, 55, 720 A.2d 1170 (1998), the Court of Appeals said that, ordinarily, "the conviction or guilty plea of a co-perpetrator may not be used as substantive evidence of another's guilt." Although there are exceptions to the general rule, these have been "narrowly confined to situations where the evidence has a special relevance presented by the circumstances . . . ." *Id.* at 56, 720 A.2d 1170. Subsequently, in *Casey v. State*, 124 Md.App. 331, 722 A.2d 385 (1999), we determined that the admission of a co-conspirator's guilty plea constituted reversible error; the "State is not entitled to present evidence of an alleged co-conspirator's guilty plea." *Id.* at 341, 722 A.2d 385. This is because such evidence might be misused by a jury and could contribute "to the rendition of the guilty verdict." *Carr v. State*, 50 Md.App. 209, 211, 437 A.2d 238 (1981).

 Relying on *Casey*, the court below found that "the State improperly offered the fact of [Smith's] conviction, and that it was not harmless error. Defense counsel should have objected." The State disagrees, contending that Niland's failure to object constituted reasonable trial strategy, rather than a constitutionally defective performance. We agree with the State.

Although the State elicited that Smith was convicted in the same underlying case for which Jones was on trial, Smith did not offer direct testimony implicating Jones. Additionally, although Smith's statement to police was admitted in evidence after he unexpectedly recanted, Smith insisted in his testimony that the police fabricated portions of the statement and that he lied as to other portions. In any event, Smith's guilt did not necessarily mean that appellant was also one of the murderers.

It is also noteworthy that, at trial, the defense conceded that Jones was involved in the robbery of Gulston, but denied that

he was a participant in either murder. In his opening statement to the jury, Jones's attorney argued:

> [B]ut the involvement of Thomas Jones in this robbery ceased before any killing took place in this case totally unconnected to the carrying out of force that was exerted during the robbery by Mr. Gutrick. And in the case of Mr. Jamal Johnson, Thomas Jones was not even present when Mr. Johnson was killed.

Further, defense counsel asserted to the jury: "[Y]ou may well find him guilty of some offenses in this case including robbery or possibly kidnapping, but you cannot find him guilty of either of these murders." Similarly, in closing, Jones's lawyer argued that the robbery of Gulston was over before the killing occurred, Gutrick killed both men, and "Thomas Jones did not kill anybody in this case."

In his post-conviction testimony, Niland was unwavering that he had evaluated the evidence of Smith's conviction and considered it helpful to his effort to concede involvement in the robbery, but to separate Jones from the two homicides. As Niland stated, his strategy was to "distance him, Thomas Jones, as much as I could from these other hoodlums." At the hearing, Niland explained his strategy:

> Well, I think at the time I thought that this man, Smith, admitting that he was convicted of both of these homicides tended to reenforce my theory that alienated the defendant from these homicides or alienated the defendant from participation in these homicides and so I didn't think it was harmful.

We are satisfied that Niland's performance represented a reasonable trial strategy. Based on defense counsel's strategy, appellant was not tainted by Smith's conviction, because appellant admitted some degree of culpability, but contended that he was not involved in the murders. Therefore, in this respect, defense counsel's representation was not constitutionally deficient.

## III.

### A.

Jones complained to the post-conviction court that Niland's performance was deficient because he did not object to the admission of Gutrick's incriminating hearsay statement ("we killed him"), contained within the written hearsay statement of Smith. He argued that Gutrick's remark constituted inadmissible hearsay within hearsay. The post-conviction court found that Niland "probably should have objected" to the statement. The court also said that Niland had objected to "the entire statement," but did not "specifically object to the above statement." Further, it determined that Smith's statement contained "multiple hearsay," and that trial counsel's performance "did fall below a standard of reasonableness when he failed to object to the admission of the multiple hearsay statement."

The State maintains that Niland did, in fact, object to the admission of Smith's entire written statement, and therefore the post-conviction court was clearly erroneous in finding to the contrary. According to the State, if Niland objected, his performance was not deficient.[8] As to the merits, the State seems to contend that, even if Niland failed to object, he was not ineffective, because Smith's entire statement was admissible as a prior inconsistent statement under the rationale of *Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993), and Md.

---

8. In its opening brief and in its reply, the State refers us to three places in the record to support its claim that Niland objected to the admission of the statement. In our view, those references do not support the State's claim. Moreover, we have combed the record to verify the State's assertion, and cannot find support for the State's contention. In any event, we observe that if the State is correct that Niland did object, this would seem to strengthen Jones's argument that his appellate counsel was ineffective in failing to raise the issue on appeal.

Curiously, in his brief, appellee seems to agree with the State that Niland "objected to the introduction of the statement in its entirety." But, he complains because Niland did not specifically object to Gutrick's statement. Jones has not provided us with any citation to the record to support his contention that Niland objected to the statement in its entirety.

Rule 5–802.1(a).[9] Additionally, in the State's reply brief, it asserts for the first time that Gutrick's statement was admissible under the co-conspirator exception to the hearsay rule, codified in Md. Rule 5–803(a). That rule provides that a "statement by a co-conspirator of the party during the course and in furtherance of the conspiracy" is not excluded by the rule against hearsay.

We begin by exploring the threshold question of whether Niland objected to the admission of Gutrick's comment, contained within Smith's statement. Because of the State's contention that Niland objected, we must review in detail the events that culminated in the admission of Smith's written statement.

As we noted earlier, the prosecutor first questioned Smith about his statement (State's Exhibit 50) only after Smith surprised both the State and the defense by denying knowledge of the murders. Although Smith acknowledged his handwriting and his signature, he claimed at trial that the statement was coerced by the police. At the bench, the prosecutor then offered Smith's statement in evidence. Niland responded: "Well, I think we're a ways from that yet." A lengthy discussion ensued, at which the State argued, *inter alia*, that Smith had already authenticated the document. Niland observed that Smith denied the truth of the content of his written statement, adding:

> He hasn't been asked any questions about any purported admission made to him by the defendant or perhaps more importantly any observation that he made with respect to the defendant that's contained in this statement.

> I think the only things that would be admissible from the statement, if any of it was admissible … is it either

---

**9.** The Maryland Rules of Evidence took effect on July 1, 1994, about one year after the occurrence of the crimes in this case. Thus, the rules were in effect at the time of Jones's trial in December 1996. In any event, Rule 5–802.1(a) is merely a codification of the holding in *Nance*, which was decided prior to appellee's trial. *See Tyler v. State*, 342 Md. 766, 775, 679 A.2d 1127 (1996); *Corbett v. State*, 130 Md.App. 408, 419, 746 A.2d 954, *cert. denied*, 359 Md. 31, 753 A.2d 3 (2000).

admissible hearsay exception to the hearsay [sic] or I believe in this statement there's someplace where he says he was involved with others with regard to one of these shootings and that—and then the only thing, only other thing, he says I think is that the defendant, he may have some observations that he actually personally made with regard to the defendant that wouldn't ordinarily be admissible.

So I think the next thing that has to happen here is that there be an isolation and a denial on his part or refusal on his part with regard to admissible areas of the statement.

The court essentially agreed with the defense. The judge said to the prosecutor: "You're offering [the statement] en mass and I'm rejecting [it] en mass."

Thereafter, the trial judge, *sua sponte*, undertook a review of Smith's statement to determine whether there was any need for redaction. Although neither the State nor the defense made any suggestions or requests to the court, the judge concluded that the following portion of Smith's statement constituted inadmissible "hearsay within hearsay": "So Don [Gutrick] told TJ [i.e., appellant] about some guy named Gary [Gulston] that he [i.e., Gutrick] had robbed before." [10] Other than that statement, the court indicated that "the rest of the statement certainly would be admissible. . . ." Nevertheless, in an obvious attempt to exercise care and caution, the trial court asked Niland his "position" about the rest of the statement. Niland responded: "If the witness wrote this, then I don't have any objection to the contents of it period." Niland added that he wanted "to clarify" and "make sure" that Smith actually wrote the text of the statement, as well as the questions and answers that were included in the statement. Subsequently, Niland asked the court to redact an exchange between Smith and the detective. According to the transcript, it read: "[Question]: Did TJ and Don say what happened when they were gone? [Answer]: That they left him [i.e.,

---

10. The record only contains the redacted copy of Smith's statement. Therefore, we have relied on the transcript to ascertain the wording of those portions of Smith's statement that were redacted.

Gulston] over his mother's." The court readily agreed to Niland's request.

Thereafter, the court again invited counsel to identify any other concerns, stating: "Now let's deal with any other issues you wish to deal with." Niland responded: *"The document itself should not be admitted. The contents, if you're going to admit, should be read to the jury ...."* (Emphasis added). Niland explained his concerns, stating that if the document itself were admitted the jury might place "greater weight" on it, because it is a document. Niland did not voice any objection to the admission of the *content* of the statement, however. The court opted to defer ruling until after the voir dire of Smith.

Out of the jury's presence, Smith was questioned about his role in providing the statement. Smith acknowledged that, with respect to the question and answer portion, he wrote the answers that appeared in the statement, but he claimed that the answers to the questions and the content of his statement were inaccurate.

The court then raised the matter of Niland's earlier request that the statement, if admissible, "should only be read, but not physically admitted." Niland then renewed his request that the court only permit the prosecutor to read the statement, but bar the State from "physically" admitting the document. He explained: "You're giving a lot greater emphasis by giving a prior statement he made and the opportunity for [the jurors] to read it and re-read it and put more emphasis on it than by simply reading it to them and placing it in evidence, and I think this is ... very important. I don't think it's just a technical issue I'm raising."

The State disagreed. When the State then offered Smith's redacted statement, Niland objected only "[o]n the grounds previously stated." The judge reserved ruling and, at the bench, told the State that it had "to explore a little further an evidentiary basis to show there is an inconsistency."

In his trial testimony, Smith maintained that he did not participate in the murders and was not a witness to what

occurred. He also denied talking to Jones about the matter. When the State again offered Smith's statement into evidence, the court said it would rule "after cross." On cross-examination, the following occurred:

[NILAND]: Your testimony now is that you did not participate in either one of these shootings that took place at Alpine Street and Cricket Place that is the subject of this case?

[SMITH]: Yeah.

[NILAND]: And you're the same Derrick Smith who was convicted in a trial by jury of both those murders?

[SMITH]: Yes.

[NILAND]: Well, how is it that on December the 2nd, 1993, when the police took this statement from you that you were able to tell them all these things?

[SMITH]: They forced me to write a statement. They told me what to say.

\* \* \*

[NILAND]: *The last question on page 6 says, "Did Don or TJ say anything when they came back?"*

*The answer says, "When Don came back upstairs Jason asked him where the other person was at and he said we killed him."*

See that?

[SMITH]: Yes.

[NILAND]: That's in your writing?

[SMITH]: Yes.

[NILAND]: *Did the policeman tell you to write that?*

[SMITH]: *No, I heard that somewhere.*

[NILAND]: You heard that somewhere?

[SMITH]: Yeah.

[NILAND]: *You heard that Don had killed the guy?*

[SMITH]: *Yeah.*

(Emphasis added).

On redirect examination, Smith insisted that the police had tried to "frame" him. He also claimed that the police dictated half his statement and he fabricated the other half. Thus, Smith maintained that the content of the statement was not true, adding: "I don't lie." Later, the judge said to the prosecutor: "You have offered [the statement], I'll reserve ruling. We'll discuss it at a later time."

After the State recalled Detective Rostich, who took Smith's statement, the State again offered Smith's written statement into evidence. Before Niland uttered any objection, the court instructed counsel to approach the bench, and the following transpired:

[THE COURT]: Other than the objection you have placed on the record do you have any additional objections? Any reasons why we should not receive [the written statement]?

[DEFENSE ATTORNEY]: No, Your Honor.

[THE COURT]: Objection is overruled. [The statement] is admitted.

The foregoing exchanges clearly demonstrate that the trial judge asked defense counsel on several occasions to identify any objectionable portions of Smith's statement, with an eye toward redaction, and even alerted Niland to a concern about "hearsay within hearsay." Moreover, while questioning Smith, Niland actually highlighted Gutrick's comment, because he specifically asked Smith about it. Most important, contrary to the State's contention, Niland did *not* object to the portion of Smith's statement containing Gutrick's assertion, nor did Niland generally object to the admission of the *content* of Smith's statement. Instead, Niland made a specific and limited challenge to the physical admission of Smith's statement, and expressly advanced as his sole reason his concern that it would receive undue weight from the jury because it was a document.

**218** 

 It is well established that a party opposing the admission of evidence "shall" object "at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." Md. Rule 4–323(a); *see Klauenberg v. State,* 355 Md. 528, 545, 735 A.2d 1061 (1999); *Hill v. State,* 134 Md.App. 327, 351, 759 A.2d 1164, *cert. denied,* 362 Md. 188, 763 A.2d 735 (2000). A proper objection is required so that the proponent of the evidence has an opportunity to "rephrase the question or proffer so as to remove any objectionable defects, if possible." *Hall v. State,* 119 Md.App. 377, 389, 705 A.2d 50 (1998). A timely objection also enables the trial court to attempt to cure any error, which helps to avoid unnecessary appeals. *Id.* at 389–90, 705 A.2d 50. Thus, an appellate court may review the admissibility of evidence only when an objection is properly made. *Klauenberg,* 355 Md. at 545, 735 A.2d 1061; *Conyers v. State,* 354 Md. 132, 149, 729 A.2d 910, *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); *Hill,* 134 Md.App. at 351, 759 A.2d 1164; *Hall,* 119 Md.App. at 389, 705 A.2d 50; *Holmes v. State,* 116 Md.App. 546, 558, 698 A.2d 1139 (1997), *aff'd,* 350 Md. 412, 712 A.2d 554 (1998).

 On the other hand, Maryland Rule 4–323(a) also provides that "[t]he grounds for the objection need not be stated unless the court, at the request of a party or on its own initiative, so directs." If a general objection is made, and neither the court nor a rule requires otherwise, it "is sufficient to preserve all grounds of objection which may exist." *Grier v. State,* 351 Md. 241, 250, 718 A.2d 211 (1998); *see Ali v. State,* 314 Md. 295, 305–06, 550 A.2d 925 (1988). But, when particular grounds for an objection are volunteered or requested by the court, "that party will be limited on appeal to a review of those grounds and will be deemed to have waived any ground not stated." *Leuschner v. State,* 41 Md.App. 423, 436, 397 A.2d 622, *cert. denied,* 444 U.S. 933, 100 S.Ct. 279, 62 L.Ed.2d 192 (1979); *see Malpas v. State,* 116 Md.App. 69, 86–7, 695 A.2d 588 (1997); *Monk v. State,* 94 Md.App. 738, 746, 619 A.2d 166 (1993); *Banks v. State,* 84 Md.App. 582, 588, 581 A.2d 439 (1990).

■ Under the circumstances of this case, Niland's failure to object to Gutrick's remark amounted to a waiver of any claim of error as to the admission in evidence of Gutrick's statement. Rather, the only issue preserved for appellate review on direct appeal concerned the physical admission of Smith's written statement. Nevertheless, if Smith's entire statement was properly admitted, as the State maintains, then Niland's failure to object would not amount to deficient performance. We turn to explore that issue.

■ Smith's statement was unmistakably hearsay under Md. Rule 5–801(c) and Maryland case law. It was a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Ali v. State, supra,* 314 Md. at 304, 550 A.2d 925; *see Tyler v. State,* 342 Md. 766, 773, 679 A.2d 1127 (1996). Moreover, in Smith's hearsay statement, he referred to Gutrick's out-of-court statement, which incriminated Jones. Therefore, Gutrick's statement constituted hearsay within hearsay. The question, then, is whether Smith's entire statement was admissible under an exception to the hearsay rule. *See* Md. Rule 5–802. Put another way, the question is whether a timely objection by defense counsel would have had merit.

In its opening brief, the State devoted about one page to this issue. It summarily argued that the "contested hearsay [i.e. Gutrick's statement] was part of" Smith's statement, and that Smith's entire statement was admissible as a prior inconsistent statement under *Nance v. State,* 331 Md. 549, 629 A.2d 633 (1993), and Md. Rule 5–802.1(a), because Smith recanted, his statement was reduced to writing and signed by him, and he was present at trial and subject to cross-examination.[11] In propounding that argument, however, the State never sub-

---

11. The State does not contend that Jones adopted or ratified Gutrick's statement. Nor does the State contend that Gutrick's statement was admissible based on the exception to the hearsay rule for a declaration against penal interest. *See* Md. Rule 5–804(b)(3); *State v. Matusky,* 343 Md. 467, 682 A.2d 694 (1996); *see also Williamson v. United States,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994); *State v. Standifur,* 310 Md. 3, 526 A.2d 955 (1987).

stantively addressed the matter of Gutrick's hearsay within hearsay statement, apart from citing Rule 5–805. It states:

**Rule 5–805. Hearsay within hearsay.**

If one or more hearsay statements are contained within another hearsay statement, each must fall within an exception to the hearsay rule in order not to be excluded by that rule.

The landmark case of *Nance v. State, supra*, 331 Md. 549, 629 A.2d 633, was decided in August 1993, about one month after the murders in this case, but more than three years before the trial. There, the Court of Appeals "carved out an important exception to the general rule against the admissibility of prior inconsistent statements as substantive evidence." *Stewart v. State*, 342 Md. 230, 237, 674 A.2d 944 (1996). The *Nance* Court held, *inter alia*, that the factual portion of a witness's prior signed statement is admissible at trial as substantive evidence when inconsistent with the witness's in-court testimony, as long as the witness is subject to cross-examination concerning the statement. *Nance*, 331 Md. at 570–71, 629 A.2d 633; *see Tyler*, 342 Md. at 775, 679 A.2d 1127; *Stewart*, 342 Md. at 237, 674 A.2d 944; *Makell v. State*, 104 Md.App. 334, 339, 656 A.2d 348 (1995).

Nance and Hardy were convicted of murder and, on appeal, the Court considered various evidentiary issues that arose because of three "turncoat" witnesses who recanted at trial "by disavowing" their prior statements or by lapses of memory. *Id.* at 556, 656 A.2d 348. In that context, the Court addressed the admissibility, as substantive evidence, of signed statements given to police, grand jury testimony, and out-of-court identifications, all provided by witnesses who had implicated the defendants prior to trial but then repudiated their statements at trial. We focus here on the discussion concerning the signed statements given to police.

In *Nance*, the statements to the police were in the form of questions and answers, in which the witnesses identified the defendants as the assailants in the context of "larger descriptions of what happened . . . ." *Id.* at 564, 629 A.2d 633. The

Court observed that a prior statement of a witness is inconsistent with the witness's trial testimony if repudiated either by "positive contradictions" or "claimed lapses of memory." *Id.* n. 5. Although the Court acknowledged that the prior statements given by the witnesses to the police were hearsay, the Court determined that they were admissible as substantive evidence, stating: "We hold that the factual portion of an inconsistent out-of-court statement is sufficiently trustworthy to be offered as substantive evidence of guilt when the statement is based on the declarant's own knowledge of the facts, is reduced to writing and signed or otherwise adopted by him, and he is subject to cross-examination at the trial where the prior statement is introduced." *Id.* at 569, 629 A.2d 633 (footnote omitted).

Of particular significance here, the Court clarified in a footnote that it had not sanctioned a blanket admission of a prior inconsistent statement. The Court admonished that the prior statement "may contain inadmissible opinions or conclusions of the witness, *or hearsay,* in addition to a recitation of the facts about which the witness claimed first-hand knowledge." *Id.,* n. 9. In that circumstance, the Court cautioned that the "inadmissible portions of the statement should be redacted." *Id.* The Court's admonition guides us here.

Maryland Rule 5–802.1(a) codifies the Court's holding in *Nance.* It provides:

**Rule 5–802.1. Hearsay exceptions—Prior statements by witnesses.**

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

(a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and signed by the declarant; or (3) recorded in substantially

verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement;

 Applying *Nance* and Md. Rule 5–802.1, it is apparent that even if Smith's signed statement to police was substantively admissible as a prior inconsistent statement, the State could not introduce through Smith's statement what it could not have elicited from Smith had he cooperated in his testimony on the witness stand. In other words, if Smith could not have testified in court to what Gutrick said, neither could his statement be used to do it for him. As the Court said in *Streater v. State*, 352 Md. 800, 724 A.2d 111 (1999):

> A fundamental principle of the law of evidence is that inadmissible evidence does not become admissible simply by being clothed within evidence that is admissible. The rule that applies to hearsay within hearsay is a prime example. . . .

*Id.* at 813–14, 724 A.2d 111 (footnote omitted).

 Because *Nance* was decided more than three years before trial, defense counsel certainly should have been aware of its content, particularly in light of its importance to the development of the law in this State. Therefore, with respect to trial counsel's failure to object to the multiple hearsay within Smith's statement, we agree with the court below that Niland's performance was deficient.

 Under *Strickland*, of course, deficient performance does not give rise to a presumption of prejudice. *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052. Therefore, Jones had to demonstrate prejudice; he had to show "a reasonable probability that, but for his counsel's unreasonable errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. That issue was only summarily addressed by the post-conviction court, and requires further analysis.

The State asserts that, in light of the "overwhelming evidence of Jones's guilt," defense counsel's performance in regard to the hearsay statement "did not impact on the outcome of Jones's trial." In its reply brief, the State adds

that, even if defense counsel could have precluded the admission of Gutrick's remark, the rest of Smith's statement was admissible and "implicated Jones in the robbery, and thus, the felony murder.... It also served to corroborate the version of events contained in Jones's statement to police." In characterizing the State's case as "overwhelming", the State points to the following: Jones's statement, in which he admitted placing a pillow over Gulston's head while Gutrick shot Gulston; Michelle's eyewitness account of the robbery, although she was unable to identify anyone; and "physical evidence corroborating" the statements of Jones and Smith. We reject the State's characterization of the strength of its case. Moreover, in the context of this case, we are of the view that if Gutrick's hearsay statement was inadmissable, then its admission in evidence " 'so upset the adversarial balance between the defense and prosecution that the trial was unfair and the verdict rendered suspect.' " *Perry,* 357 Md. at 87, 741 A.2d 1162 (citations omitted). We explain.

The case was certainly a close one with respect to appellant's guilt in the felony murder of Gulston. Jones's defense was, in essence, an acknowledgment of his participation in a robbery; he claimed, however, that his involvement in the crime ended prior to Gulston's murder. In opening statement, Jones's lawyer said: "[T]he defense in this case contends that there was a robbery ... of Mr. Gulston of his drug money and possibly some of his drugs, that there was a kidnaping of Mr. Gulston, but the involvement of Thomas Jones in this robbery ceased before any killing took place...."

No physical or forensic evidence ever linked Jones to Gulston's murder or established his presence at Jeannette's home at the relevant time. To the contrary, as the Court noted in *Jones I,* appellant was tied to the murder of Gulston based primarily on two critical pieces of evidence: his own statement *and* Smith's statement. Although Smith's statement to police was a central part of the State's case against Jones, Smith never said in his statement that *he* knew who killed Gutrick, or even the circumstances of the murder. Rather, the evidence showed that at the time of Gulston's murder, Smith was

at Michelle's residence, guarding her and Johnson, while Jones and Gutrick were at Jeannette's home with Gulston. Consequently, Smith had no personal knowledge of what happened at Jeannette's home. Nevertheless, Smith included in his statement a damaging admission attributed to Gutrick: "we killed him." In context, Gutrick meant that he and Jones killed Gulston. Absent that portion of Smith's statement, the jury would have been left only with Jones's confession, along with corroboration of other aspects of the crimes, but no corroboration directly linking Jones to the felony murder of Gulston.

In his closing argument to the jury, the prosecutor relied on both Smith's statement and Jones's statement. The prosecutor explained Smith's reluctance to testify by saying that "persons that testify in the courtroom such as this against another defendant are not favorably regarded in the Department of Corrections, but nonetheless you will have his statement and you can consider that."

To be sure, Jones could have been convicted on the basis of his confession. But, it was not so impregnable as to diffuse an erroneous admission of Gutrick's assertion. Again, we explain.

As our factual summary revealed, prior to trial Jones unsuccessfully sought to suppress his confession. At trial, however, the issue of voluntariness remained a matter for the jury to resolve. The detectives recounted that, in the period following Jones's arrest, he was under the influence of PCP, and therefore the detectives did not question him immediately, because they wanted to "allow the effects of the PCP to wear off." Because of the drugs, they described Jones as "agitated," "incoherent," "boisterous," and "violent" and, at other times, "lucid." At one point, Jones tried to escape and was eventually taken to the hospital. When he was finally interviewed by police the next morning, he did not appear to the detectives to be under the influence of drugs.

Jones's lawyer objected to the admission of Jones's confession at trial, based on "the prior litigation concerning the

statement." Although the judge overruled the objection, the question of voluntariness was not specious, and the jury was specifically instructed to consider the matter. In its instructions to the jury, the court said:

> Evidence has been introduced that the defendant made a statement to the police about the crime charged. The State must prove beyond a reasonable doubt that the statement was freely and voluntarily made.
>
> A voluntary statement is one that under all the circumstances was given freely. To be voluntary it must not have been compelled or obtained as a result of any force, promises, threats, inducements, or offers of reward.
>
> In deciding whether the statement was voluntary, consider all of the circumstances surrounding the statement including the conversations, if any, between the police and the defendant, whether the defendant was warned of his rights, the length of time that the defendant was questioned, who was present, the mental and physical condition of the defendant, whether the defendant was subjected to force or threat of force by the police, the age, background experience, education, character and intelligence of the defendant, whether the defendant was taken before a District Court Commissioner without unnecessary delay following arrest and, if not, whether that affected the voluntariness of the statement, any other circumstances surrounding the taking of the statement.

In our view, the admission of Smith's entire statement was prejudicial, as defined by the Supreme Court and the Maryland Court of Appeals. Under the circumstances attendant here, Gutrick's comment, included in Smith's statement, may well have been a decisive factor in persuading the jury to conclude that Jones's confession was both voluntary and accurate. Conversely, without Gutrick's comment, the jury might have reached a different conclusion as to the reliability, accuracy, or voluntariness of Jones's confession. Although the evidence of Jones's guilt surely was legally sufficient to warrant submission of the case to the jury, and a jury may well have been persuaded of Jones's guilt beyond a reasonable

doubt, based on his confession alone, we would hardly characterize such a case as "overwhelming."

We recognize that in *Jones I* the Court said that even if Smith was not a witness to the murder of Gulston, he could be found liable as an accomplice. That remains as true now as it was then. But, that potentiality does not obviate the palpable prejudice here. As we see it, there is a substantial possibility that, if the hearsay within hearsay portion of Smith's statement was inadmissible, and had not been admitted, the outcome as to the verdict for Gulston's murder might have been consistent with the verdict concerning Johnson's murder. *See Wilson,* 363 Md. at 353, 768 A.2d 675.

We agree with the court below that defense counsel generally provided excellent legal representation. But, we must analyze the occasional lapses that occur in the heat of battle. If Gutrick's assertion was erroneously admitted as part of Smith's statement to police, it was prejudicial to Jones, because it provided an important piece of corroborating evidence that the jury undoubtedly could consider to convict Jones of Gulston's murder. Therefore, unless Smith's statement was admissible in its entirety, Jones was surely prejudiced by his trial counsel's failure to object to Gutrick's hearsay within hearsay comment contained in Smith's statement.[12]

Based on our conclusion that the double hearsay was not admissible under *Nance* or Md. Rule 5–802.1(a), we next explore the State's contention that Gutrick's assertion was admissible under the co-conspirator exception to the hearsay rule. In this regard, we must also consider Jones's motion to strike the State's reply brief, the State's opposition to that motion, as well as the State's Motion to Reconsider.

---

**12.** Although the post-conviction court also attributed error to the trial judge based on the admission of Gutrick's statement, it is difficult for us to fault the trial judge for what transpired. As the record reflects, the trial judge, *sua sponte,* reviewed Smith's statement to ferret out any improper portions, repeatedly invited counsel to identify potential problems, was quick to strike anything that appeared problematic, and alerted counsel to the issue of multiple hearsay. Defense counsel never asked the court to redact Gutrick's statement.

## B.

When the State advanced the co-conspirator exception in its reply brief, Jones was prompted to file a motion to strike. He vigorously urged us to find waiver with respect to the State's belated contention, because the State never raised the co-conspirator argument at the post-conviction hearing or in its opening brief.[13]

In its initial brief, the State argued only that Smith's hearsay statement was admissible under *Nance,* 331 Md. 549, 629 A.2d 633, and Md. Rule 5–802.1(a). Although the State opposed appellee's motion to strike, it did not dispute that it failed to present in its opening brief the issue of the co-conspirator exception. Nor did the State offer any reason for its failure to raise the issue until the reply brief. Instead, the State urged us to overlook its omission, claiming the State merely amplified in its reply brief[14] an argument that it previously presented to the post-conviction court, and which it included in its Application for Leave to Appeal (the "Application"), filed on September 17, 1999.

In support of the State's position that the co-conspirator exception to the hearsay rule was raised below, it refers us to two pages from the transcript of those proceedings. The following excerpt appears on the pages cited by the State, and is illustrative:

> [THE STATE]: I see no prejudice from any of the ... acts by Mr. Niland. I think there was ample evidence for conviction here, and Mr. Niland did a heck of a job, and I would submit that any—the case, the statement by Mr. Jones, the defendant, went up on appeal.... It was a good statement, and that was the agency, and that statement you know, convicted him.

---

**13.** At the post-conviction hearing, the State was represented by an Assistant State's Attorney for Prince George's County, not an Assistant Attorney General.

**14.** The amplification in the reply brief with respect to the co-conspirator exception consists of about one page, without citation to any cases.

And if he had kept out the statement by ... Mr. Smith[, Jones] still would have been convicted, because the one statement and all the other corroborating evidence ...

[THE COURT]: Does what you say fly in the face of *Carr [v. State*, 50 Md.App. 209, 437 A.2d 238 (1981) ], which was the law?

[THE STATE]: *Carr* has some qualifications to it, Your Honor. It indicates that if the State can prove that it was harmless or the evidence was cumulative, then the State can prevail. *Carr*—it's qualified, it's a qualified case, and it was a conspiracy case also. The difference is this; in a conspiracy case you have to conspire with somebody, and if one person is convicted of conspiracy, then normally the jury will say, well, if he's been convicted of conspiracy he must have conspired with everybody.

It's logical to conclude that the defendant is guilty, but that's not true.... *[T]his is not a conspiracy case....*

(Emphasis added).

As we see it, the foregoing colloquy does not even remotely establish that the State presented the issue of the co-conspirator exception at the post-conviction hearing. Moreover, it is equally clear that the post-conviction court never addressed the issue. It is true, however, that, in its Application, the State argued that Gutrick's statement was admissible under the co-conspirator exception. There, the State asserted:

It is clear from the context of this statement and the other evidence presented at trial that Donald Gutrick's remark to Derrick Smith was made before the criminal enterprise that started at 6804 Alpine St. was over ... The remark was clearly admissible as a statement of a coconspirator made during the course of and in furtherance of the conspiracy.

 Nevertheless, the State has not referred us to any authority that suggests it may preserve an issue for appellate review merely by including it in an Application. In our view, the State's reference to the co-conspirator exception in its Application is not an adequate substitute for the State's failure to raise the argument below or in its opening brief.

We are left with several unassailable facts. The State did not raise the co-conspirator hearsay exception at the post-conviction hearing and, as a result, the post-conviction court did not address the merits of that argument. Moreover, the State did not raise the issue in its opening brief with this Court. Rather, it was raised for the first time in the State's reply brief.

Ordinarily, if an argument is not raised at trial or in proceedings below, it is not preserved for appellate review. Maryland Rule 8–131(a); *See, e.g., Ware v. State*, 360 Md. 650, 692, 759 A.2d 764 (2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 864, 148 L.Ed.2d 776 (2001) (recognizing that appellant waived appellate review of jury instruction because appellant "never objected to the instruction"); *Conyers*, 354 Md. at 148, 729 A.2d 910 (acknowledging that Maryland Rule 8–131(a) limits appellate review to those issues " 'raised in or decided by the trial court' ") (citation omitted); *Walker v. State*, 338 Md. 253, 262, 658 A.2d 239 (declining to address appellant's assertions of ineffective assistance of counsel because "nothing in the record ... indicate[d] that these issues were ever raised or decided below"), *cert. denied*, 516 U.S. 898, 116 S.Ct. 254, 133 L.Ed.2d 179 (1995); *Jacobs v. Flynn*, 131 Md.App. 342, 376, 749 A.2d 174, *cert. denied*, 359 Md. 669, 755 A.2d 1140 (2000) (refusing to address appellant's contention that trial court should have conducted an evidentiary hearing, because appellant failed to raise issue below); *Bond v. PolyCycle, Inc.*, 127 Md.App. 365, 383, 732 A.2d 970 (1999) (declining to address a constitutional issue raised for the first time on appeal); *Walker v. State*, 107 Md.App. 502, 520, 668 A.2d 990 (1995) (noting that, under Maryland Rule 8–131, "an appellate court will ordinarily only consider 'those issues that were raised or decided by the trial court, unless the issue concerns the jurisdiction of the court to hear the matter' ") (citation omitted), *aff'd*, 345 Md. 293, 691 A.2d 1341 (1997).

To be sure, there are occasions when an appellate court may exercise its discretion to consider an argument that is not preserved. Maryland Rule 4–325(e) expressly confers

discretion on an appellate court, acting "on its own initiative or on the suggestion of a party [to] take cognizance of any plain error in the [jury] instructions, material to the rights of the defendant, despite a failure to object." The same concept applies with respect to " 'errors of law generally....' " *Rubin v. State,* 325 Md. 552, 587, 602 A.2d 677 (1992) (citation omitted). But, even if we were inclined, in our discretion, to overlook the State's failure to raise the co-conspirator exception at the post-conviction hearing, we would expect the State to raise the issue in its opening brief. The cases are legion, in Maryland and elsewhere, that an appellate court generally will not address an argument that an appellant raises for the first time in a reply brief.

In *Federal Land Bank of Baltimore, Inc. v. Esham,* 43 Md.App. 446, 406 A.2d 928 (1979), we observed:

[I]t is necessary for the appellant to present and argue all points of appeal in his initial brief. As we have indicated in the past, our function is not to scour the record for error once a party notes an appeal and files a brief.

In prior cases where a party initially raised an issue but then failed to provide supporting argument, this Court has declined to consider the merits of the question so presented but not argued.

*Id.* at 457–58, 406 A.2d 928 (citations omitted). *See Health Servs. Cost Review Comm'n v. Lutheran Hosp.,* 298 Md. 651, 664, 472 A.2d 55 (1984)( "[A] question not presented or argued in an appellant's brief is waived or abandoned and is, therefore, not properly preserved for review."); *Conaway v. State,* 108 Md.App. 475, 484–85, 672 A.2d 162, *cert. denied,* 342 Md. 472, 677 A.2d 565 (1996); *Monumental Life Ins. Co. v. United States Fid. & Guar. Co.,* 94 Md.App. 505, 544, 617 A.2d 1163, *cert. denied,* 330 Md. 319, 624 A.2d 491 (1993); *Holiday Universal Club v. Montgomery County,* 67 Md.App. 568, 570 n. 1, 508 A.2d 991, *cert. denied,* 307 Md. 260, 513 A.2d 314 (1986), *appeal dismissed,* 479 U.S. 1049, 107 S.Ct. 920, 93 L.Ed.2d 973 (1987); *see, e.g., Utah v. Maestas,* 997 P.2d 314, 320 n. 4 (Utah 2000) (stating that it "is too late" to raise an

argument in reply brief), *cert. denied,* 4 P.3d 1289 (2000); *United States v. Michaud,* 925 F.2d 37, 43 n. 8 (1st Cir.1991) (refusing to reach merits of claim raised for first time in reply brief, because "[a]rguments relating to issues not raised in an opening brief are waived."); *Zambrana v. United States,* 790 F.Supp. 838, 843 (N.D.Ind.1992) (recognizing that "[r]eply briefs are an improper vehicle for presenting new arguments, and should be confined to the issues raised in the opening ... brief"); *United States v. Blumenthal,* No. 96–17085, 1997 WL 697441, at *1 n. 2, 1997 U.S.App. LEXIS 30584, at *2 n. 2 (9th Cir.1997); *United States v. Carrasco,* No. 99C559, 1999 WL 286083, at *2 n. 2, 1999 U.S. Dist. LEXIS 6542, at *5 n. 2 (N.D.Ill.1999).

A reply brief serves a limited purpose. *See Fed. Land Bank,* 43 Md.App. at 459, 406 A.2d 928. An appellant is supposed to use the reply brief to respond to the points and issues asserted in the appellee's brief which, in turn, are ordinarily offered by the appellee in response to the appellant's contentions in the opening brief. *See Mayor and City Council v. New Pulaski Co. Ltd. P'ship,* 112 Md.App. 218, 233–34, 684 A.2d 888 (1996), *cert. denied,* 344 Md. 717, 690 A.2d 523 (1997); *Berkson v. Berryman,* 63 Md.App. 134, 140–41, 492 A.2d 338, *cert. denied,* 304 Md. 296, 498 A.2d 1183 (1985). If an appellant is permitted to interject new claims or issues in a reply brief, this may well result in a "fundamental injustice upon the appellee, who would then have no opportunity to respond in writing to the new questions raised by appellant." *Fed. Land Bank,* 43 Md.App. at 459, 406 A.2d 928.

The State's reliance on *Purvey, supra,* 129 Md.App. 1, 740 A.2d 54, does not support its position. There, the State appealed a decision granting post-conviction relief. In reviewing the issue regarding ineffective assistance of counsel, we considered whether to address certain matters raised by the State in its *opening* brief, which the appellee claimed were not preserved for appeal because they were not raised during post-conviction proceedings. The Court determined that the "new" arguments regarding ineffective assistance of counsel

were not really new; they were merely an expansion or "fleshing-out ... of the skeletal theories" that had been raised below. *Id.* at 12, 740 A.2d 54. In contrast to this case, the *Purvey* Court was satisfied that, on appeal, the State had merely amplified an argument that had been previously raised. Significantly, even if the State in *Purvey* had asserted a new argument on appeal, it clearly did so in its *opening* brief, not in its reply brief.

Based on all of the foregoing, in our initial opinion we granted appellee's motion to strike that portion of the State's reply brief concerning the co-conspirator exception to the hearsay rule, and declined to address the admissibility of Gutrick's statement on that basis. In doing so, however, we made clear that, in the event of a re-trial of Jones, our ruling was without prejudice to the State's right to assert the co-conspirator hearsay exception as a basis to support the admission in evidence of Gutrick's assertion.

After we filed our initial opinion, the State submitted its Motion to Reconsider, contending that we erred in failing to consider the co-conspirator exception. It also propounded yet another new argument, claiming, in effect, that its belated argument was not waivable, because the issue is whether defense counsel was or was not ineffective, regardless of whether the State proposes a valid basis to justify defense counsel's performance.[15] The State asserts:

> [I]n the context of appellate review of post conviction claims of ineffective assistance of counsel, a deficiency in the pleadings does not foreclose this Court's consideration of the constitutional issues raised by the claims of error. This is so because, in the case of claimed failure on the part of trial counsel to object to certain evidence, if there is any theory of admissibility supporting admission of the evidence, then counsel's failure to object to that evidence cannot be deemed prejudicial under the constitutional standard set forth in *Strickland v. Washington*. This Court erred in

---

15. We do not know why the State did not present this point in its reply brief or in its opposition to the motion to strike.

stating "we decline to discuss the issue" of the co-conspirator's exception to the rule against hearsay (Slip op. at 28). This Court's failure to conduct the analysis, based on the timing of the State's argument, does not comport with the required constitutional analysis, which requires resolution of the question whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. 2052.

In his response to the Motion to Reconsider, Jones characterizes the State's argument as "outrageously hypocritical." He argues:

> There is no sound legal or policy basis for applying one set of appellate rules to post-conviction cases and other principles to all other cases. Essentially, the State is asking that it be forgiven and exempted for its errors in this case and presents an inane argument seeking an exception to the general waiver rules. This Court should reject the State's arguments.
>
> \* \* \*
>
> Defendants in all courts are routinely punished for procedural defaults, particularly in the setting of post-conviction and habeas corpus litigation with the State early and often pushing such arguments. Largely, any default attributed to a defendant is the result of an error by his or her attorney. In this case, the procedural default is due to the errors of the attorneys for the State. No exception for the State's error and its seeking of a double standard is warranted in the case.

Although the State has acknowledged that, on direct appeal, a party's failure to argue a specific theory "will ordinarily constitute waiver," *see Klauenberg,* 355 Md. at 552, 735 A.2d 1061, it seems to suggest that the same standard does not apply in a post-conviction appeal by the State. In its view, the dispositive question is whether the defense lawyer was constitutionally ineffective, regardless of whether the State has asserted a viable ground to establish the adequacy of defense

counsel's performance. As we construe the State's position, it maintains that even if it did not timely offer a valid reason to show that defense counsel was not ineffective, an appellate court has an independent obligation to determine whether the defense attorney's performance was, in fact, constitutionally deficient.

In our view, the logical extension of the State's position is that there are no time constraints that apply with respect to a claim by the State that defense counsel was not constitutionally ineffective. If the State is permitted to raise a new but valid argument for the first time in its reply brief, or in a motion to reconsider after an appellate ruling is issued, then it could also raise an argument for the first time long after the Court has ruled. Moreover, applying the State's reasoning, it would be incumbent upon the Court to consider the possible universe of reasons justifying a lawyer's strategy or course of action, even if the State never raises such a point. In the extreme, the State's position means that its failure to justify defense counsel's representation is virtually irrelevant, because it is incumbent on the appellate court to determine whether there is any basis to sustain the representation afforded by defense counsel.

The State has not referred us to any legal authority to support its contention that the rules and practices that generally apply with respect to waiver, or that govern the content of reply briefs, do not apply to the State in the circumstances of this case. Our effort to uncover relevant cases that might shed light on this issue leads us to conclude that the State is, indeed, held to the same rules of practice and procedure as other litigants. Even in the face of an appellate reversal of a conviction, the State can be found to have waived or abandoned an argument that might have led to the affirmance of that conviction if the appropriate argument had been timely made. It follows that the State is wrong in suggesting that we cannot find waiver under the circumstances attendant here. On the other hand, as we noted, an appellate court generally has discretion to consider an argument that is

neither preserved nor presented, and logically that discretion would extend to an argument that is belatedly raised. *Cf. Rubin v. State, supra,* 325 Md. at 587, 602 A.2d 677; Md. Rule 4–325(e).

In *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the Supreme Court granted certiorari to consider whether, under the Fourth Amendment, a law enforcement officer may lawfully conduct a warrantless search "for the subject of an arrest warrant in the home of a third party . . . ." *Id.* at 205, 101 S.Ct. 1642. The Court observed that, at prior proceedings, the government had acquiesced to statements that the defendant's residence had been searched; belatedly, it advanced an expectation of privacy issue two years later. Because the government argued for the first time in the Supreme Court that the record did not show that the defendant had a reasonable expectation of privacy in the house that was searched, *id.* at 208, 101 S.Ct. 1642, the Supreme Court expressly declined to consider that contention. It recognized that the government "may lose its right to raise factual issues of this sort before this Court when . . . it has failed to raise such question in a timely fashion during the litigation." *Id.* at 209, 101 S.Ct. 1642. Thus, the Court said: "We conclude . . . that the government, through its assertions, concessions, and acquiescence, has lost its right to challenge petitioner's assertion that he possessed a legitimate expectation of privacy in the searched home." *Id.* at 211, 101 S.Ct. 1642.

*Rose v. United States,* 629 A.2d 526 (D.C.1993), is also noteworthy. There, on direct appeal, the defendant challenged his drug conviction, claiming the trial court erred in upholding on exigency grounds a warrantless entry into the apartment of the defendant's relatives. The government argued only that the defendant lacked standing to object to the warrantless entry. Because the panel majority concluded that the defendant had standing, the court reversed the conviction. In doing so, it declined to consider the validity of the search based on arguments previously raised by the government at the trial level, including consent and exigency, because it

determined that the government abandoned those contentions on appeal. In its view, the government made a "tactical" decision, *id.* at 534, "to rest its argument in support of the trial court's ruling solely" on the defendant's lack of "standing to object to the officers' warrantless entry," *id.* at 530, and conceded that suppression was appropriate if the defendant had standing. *Id.* at 532. The court saw no reason to "second-guess the government's appellate strategy by invoking and examining, *sua sponte,* various arguments the government" did not make, or to question its decision not "to advocate what it perceives to be losing arguments." *Id.* at 534.

We consider particularly illuminating the court's discussion of whether to address on its own the validity of the trial court's finding of exigency as a basis to uphold the trial court's decision. The court initially distinguished the situation before it from those cases in which the government confesses error; in the latter situation, the court indicated that the public interest requires the appellate court to undertake a review of the case in order to be satisfied of the error. That practice reflects that the court is the "institution performing the evaluative function that announces the law." *Id.* at 533 n. 17. But, when the government confesses error,

> there is a kind of role reversal. The prosecutor or the defense counsel, relying on his or her responsibility as an officer of the court, expresses an opinion of a kind that ordinarily would be made by a judge, whereas the appellate court, acting on its responsibility to be sure counsel has not defaulted, acts to assure that the rights of the government or the defendant, as the case may be, are duly respected, a function ordinarily performed by counsel. The policy justifying this approach is the belief that the prosecutor or defense lawyer should not completely give up the government's or the client's cause—which that lawyer should be advocating—without a judicial check on such behavior.

*Id.* at 534.

In contrast to the confession of error situation, however, the court observed that the government in the case before it had

"vigorously argued for affirmance," relying only on standing, a point that it had "selected" and believed was "best suited to achieve that end." *Id.* Because the government "assumed its traditional role of advocate", the court determined that "the adversary system should be allowed to function as such; the court no longer is needed ... to act as an institutional failsafe to make sure that the government has not compromised its prosecutorial responsibility." *Id.*

In the court's view, if it were "to scrutinize" whether the government was doing its job "well enough", the court would come "perilously close to exercising an executive branch function... inconsistent with the neutrality expected of the judiciary in our adversary system of justice." *Id.* at 535. Therefore, the court declined to assume "the role ordinarily assigned" to the prosecutor. *Id.* Instead, the court only reviewed the single argument presented by the government, reasoning that "[i]t is a basic principle of appellate jurisprudence that points not urged on appeal are deemed to be waived." *Id.* Of particular significance here, the court expressly said that the waiver principle "applies to the government no less than to the defendant in a criminal case," even if "the waived point" would have led to a different result. *Id.* at 536. As the court explained, the "public is entitled to have valid judgments of conviction sustained," *id.* at 537, but the public is also generally "bound by the actions of its counsel, just as a criminal defendant normally is. That is how the adversary system works." *Id.* at 537. *But see id.* at 540, 542 (Wagner, J., dissenting) (claiming appellate court must not "ignore applicable precedents which determine the validity of the trial court's ruling even if overlooked by the parties," because "it would be an abdication of [court's] responsibility to reverse a correct ruling;" even if counsel did not identify all legal arguments, appellate court is "not precluded from supplementing the contention of counsel *through* [its] *own* deliberation and research.") (emphasis in dissent) (citation omitted).

*United States v. Giovannetti,* 928 F.2d 225 (7th Cir.1991), is also quite helpful, because the government claimed that its

belated argument was "nonwaivable." There, the government filed a motion for rehearing after the appellate court reversed a defendant's conviction. In that motion, the government argued harmless error for the first time, contending that harmless error is "nonwaivable." *Id.* at 226. In a per curiam opinion, a panel of the Seventh Circuit (Posner, Ripple, and Manion, J.J.), found the government's "nonwaivable" contention "novel and interesting...." Moreover, the court considered the government's position, in effect, as a claim that even if it had not timely argued harmless error, the court, before reversing, "must search the record—without any help from the parties—to determine if the errors" found by the court are prejudicial. *Id.* The court disagreed, noting that the government offered no authority for that proposition. The court recognized that such a view "would place a heavy burden on the reviewing court, deprived as it would be of the guidance of the parties on the question whether particular errors were harmless." *Id.* Moreover, it would invite "salami tactics," *id.*, because the government could pursue one position in its brief and, if that failed, contend later "that it should win anyway because the error was harmless." *Id.* Accordingly, the court concluded that "harmless-error arguments can be waived." *Id.*

The reasoning of the court in *Carducci v. Regan,* 714 F.2d 171 (D.C.Cir.1983), is also useful, although it is a civil case. There, an important constitutional issue was presented, but the D.C. Circuit (Scalia, J.) declined to consider the issue, because "it was not adequately briefed or argued on appeal...." *Id.* at 172. What the court said is instructive:

> We will not resolve that issue on the basis of briefing and argument by counsel which literally consisted of no more than the assertion of violation of due process rights, with no discussion of case law supporting that proposition ... relevant to the central question....

> The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and

research, but essentially as arbiters of legal questions presented and argued by the parties before them.

\* \* \*

Of course not all legal arguments bearing upon the issue in question will always be identified by counsel, and we are not precluded from supplementing the contentions of counsel through our own deliberation and research. But where counsel has made no attempt to address the issue, we will not remedy the defect, especially were, as here, 'important questions of far-reaching significance' are involved.

*Id.* at 177 (internal citation omitted).

Numerous other cases are equally noteworthy with respect to the issue of waiver by the State. *See, e.g., Bailey v. Duckworth,* 699 F.2d 424, 425 (7th Cir.1983) (concluding in a federal habeas action that when a state appellate court initially reversed a conviction but subsequently affirmed based on an argument raised by state for first time in petition for rehearing, criminal defendant was denied "right to a full and fair opportunity to litigate" that issue; because the issue was neither raised at trial or briefed or argued on appeal, defendant "was justified in assuming the issue had been waived."); *see also United States v. Leichtnam,* 948 F.2d 370, 375 (7th Cir.1991) (reversing conviction that could have been affirmed if government had made proper argument on appeal); *United States v. Harris,* 942 F.2d 1125, 1127 (7th Cir.1991) (reversing a conviction and declining to consider an argument not raised by government on appeal); *United States v. McNeil,* 911 F.2d 768, 772 (D.C.Cir.1990); *United States v. Turner,* 898 F.2d 705, 711 (9th Cir.), *cert. denied,* 495 U.S. 962, 110 S.Ct. 2574 (1990); *United States v. Woods,* 888 F.2d 653, 654 (10th Cir.1989), *cert. denied,* 494 U.S. 1006, 110 S.Ct. 1301, 108 L.Ed.2d 478 (1990); *United States v. West,* 723 F.2d 1, 2 n. 1 (1st Cir.1983).

With respect to an appellate court's discretion to consider issues that have been waived by the prosecution, *Rose,* 629 A.2d 526, also provides guidance. There, the court expressly acknowledged that an appellate court is not "precluded from

reaching an issue *sua sponte* . . .", *id.* at 537, even if not raised by the government. Therefore, the court "could choose *sua sponte* to examine" the merits of the trial court's exigency ruling. *Id.* at 535. Nevertheless, the court opted not to do so, for several reasons: the government made a deliberate tactical decision to pursue only the standing issue, rather than an inadvertent error; appellant had no opportunity to address the alternative grounds, absent supplementary briefing; resolution of the issues would be difficult and close. Thus, the court declined to look beyond the government's unsuccessful standing argument, *id.* at 537, stating: "[T]here may be occasions when an appellate court should bail out the government by raising *sua sponte* an argument on appeal that the government has failed to raise. But this is not such a case." *Id.* at 538.

Similarly, the court in *Giovannetti, supra,* 928 F.2d 225, recognized that "[i]t is a separate question whether such a waiver [by the government] always binds the court." *Id.* at 226. Although the Seventh Circuit recognized that an appellate court is not obligated "to scour a lengthy record" on its own, with no guidance from the parties, *id.,* it also said that a court has "discretion to overlook a failure to argue harmlessness . . . ." *Id.* at 227. The court took that position, at least in part, because of its concern that an unfounded reversal "will hurt others," including "the adverse party" and "innocent third parties . . .", *id.* at 226, whose access to the courts will be "impaired" due to the additional litigation that an inflexible stance would generate. *Id.* It also recognized that "reversal may be an excessive sanction for the government's having failed to argue harmless error," *id.* at 227, particularly "if the harmlessness of the error is readily discernible without an elaborate search of the record." *Giovannetti,* 928 F.2d at 227.

In determining whether to exercise such discretion the court identified several factors, including "the length and complexity of the record, whether the harmlessness of the error or errors is certain or deliberate and whether a reversal will result in protracted, costly, and ultimately futile proceedings" in the trial court. *Id.* Ultimately, the court declined to

"relieve the government from the consequences of its failure to raise the issue of harmless error in its brief on appeal," *id.*, because it concluded that the "certainty of harmlessness" did not appear with "clarity from an unguided search of the record." *Id.*

The cases cited above elucidate for us that, in a criminal case, the State can be found to have waived a valid claim, even if the waiver leads to the reversal of a conviction. On the other hand, when the State fails to raise an important argument, an appellate court ordinarily has discretion to review the record or the trial judge's ruling in its effort to reach a sound result. Similarly, the appellate court generally retains discretion to consider an argument that is belatedly raised.

In light of the importance of the issue presented with regard to the co-conspirator exception, we have determined, in the exercise of our discretion, that a remand is appropriate, so that the parties will have an opportunity to fully litigate before the post-conviction court the question of whether Gutrick's statement was admissible under the co-conspirator exception to the hearsay rule. Moreover, we believe a remand is appropriate because resolution of the issue in the context of a post-conviction proceeding will require careful analysis of the entire record, appropriate briefing, and, perhaps, further examination of defense counsel and appellate counsel.

In reaching our decision to remand, we perceive that this is not a case in which the State made a tactical decision to forego raising the co-conspirator exception. Instead, it seems to have inadvertently omitted the argument from its initial brief after including it in the Application. Further, in contrast to some of the cases we have considered, the State eventually raised the co-conspirator issue in its reply brief; it did not fail altogether to raise the matter until after we ruled, as happened in some of the cases that we cited. Nor did it make the kinds of damaging or misleading concessions below that we saw in other cases that we discussed. To the contrary, the State has steadfastly maintained that Smith's entire statement

was admissible and has persisted in its claim that Jones's conviction should be upheld.

 To be sure, a "criminal defendant[ ], as a matter of constitutional right, sometimes can prevail on collateral attacks on their convictions based on ineffective assistance of counsel," *Rose*, 629 A.2d at 537, and there is "no constitutional counterpart justifying affirmance of a conviction based on ineffective . . . advocacy" by the State. *Id.* at 537–58. Nevertheless, "[j]ustice is not a one-way street." *Whittlesey v. State*, 326 Md. 502, 534, 606 A.2d 225, *cert. denied*, 506 U.S. 894, 113 S.Ct. 269, 121 L.Ed.2d 198 (1992). Indeed, "[a] fair trial is the entitlement of the 'People' as well as of an accused." *Gonzales v. State*, 322 Md. 62, 74, 585 A.2d 222 (1991). Therefore, we believe that a failure to consider the State's belated argument would constitute "an excessive sanction" under the circumstances of this case. *See Giovannetti*, 928 F.2d at 227. In sum, we believe the issue of appellee's entitlement to post-conviction relief in this important case ought to be decided on the merits, and not on the basis of the kind of inadvertence that may have occurred here.

## V.

We next consider whether appellate counsel's performance was ineffective, because he failed to raise on direct appeal a claim of error based on the inadmissibility of the double hearsay in Smith's statement. The State contends that the post-conviction court erred in finding that Jones's appellate counsel rendered ineffective assistance. Conversely, appellee asserts that the post-conviction court correctly found ineffective assistance based on Long's failure, *inter alia*, to challenge on direct appeal the admissibility of Gutrick's hearsay within hearsay statement, and his failure to review the trial exhibits, including Smith's statement, which was central to the case.

In his testimony, Long acknowledged that he did not review Smith's statement. His failure to review that statement, a critical component of the State's case, or to raise an issue on appeal about Gutrick's statement, might well constitute defi-

cient performance. The question remains, however, as to whether Jones was prejudiced by any dereliction of Long, given trial counsel's failure to adequately object to Gutrick's statement, so as to preserve for review on direct appeal the admission of that statement. In other words, if Niland's performance resulted in a waiver, the question is whether appellate counsel's performance was constitutionally defective based on his failure to raise an issue that was waived.

Notwithstanding trial counsel's failure to object to Gutrick's statement, a zealous appellate advocate might well have attempted to challenge its admission. An appellate attorney could have attempted to construct an argument that the issue was preserved on the basis of Niland's objection to the physical admission of the document. Indeed, the State made that argument to us. Alternatively, appellate counsel might have considered whether this was one of the rare cases in which a plain error argument might prove viable. *See Rubin,* 325 Md. at 587, 602 A.2d 677 (stating that, " 'with respect to errors of law generally, an appellate court may in its discretion in an exceptional case take cognizance of plain error even though the matter was not raised in the trial court.' ") (quoting *Dempsey v. State,* 277 Md. 134, 141–42, 355 A.2d 455 (1976)); *see also State v. Daughton,* 321 Md. 206, 210–11, 582 A.2d 521 (1990) ("[A]n appellate court may recognize *sua sponte* plain error, that is, error which vitally affects a defendant's right to a fair and impartial trial.")

Resolution of the issue regarding appellate counsel's ineffectiveness is premature, however. If Gutrick's statement was admissible under the co-conspirator exception to the hearsay rule, then obviously appellate counsel's failure to raise the issue would not have been prejudicial. On the other hand, if it was not admissible under that exception, appellate counsel's course of conduct may have been constitutionally deficient. On remand, the court should re-consider appellate counsel's performance in light of this opinion.

Finally, we note that the State does not contend that the post-conviction court erred on the ground that its ruling

applied across the board to all of Jones's convictions, including those related to Michelle and Jeannette, and the robbery and kidnaping of Gulston, which Jones's defense counsel virtually conceded. As we see it, the alleged errors of trial counsel and appellate counsel relate primarily to Jones's conviction with respect to Gulston's murder. Therefore, on remand, the post-conviction court should make clear the particular convictions to which its rulings apply.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY NEITHER AFFIRMED NOR REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLEE'S MOTION TO STRIKE DENIED. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**